[Cite as *Perrucci v. Whittington*, 2018-Ohio-2968.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MIAMI COUNTY**

| | | |
|---|---|---|
| MARK R. PERRUCCI | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 2017-CA-33 |
| | : | |
| v. | : | Trial Court Case No. 2012-CVF-2427 |
| | : | |
| CONNIE WHITTINGTON | : | (Civil Appeal from |
| | : | Municipal Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the 27th day of July, 2018.

. . . . . . . . . .

ROBERT KEHOE, Atty. Reg. No. 0017466, and KEVIN SHANNON, Atty. Reg. No. 0084095, and LAUREN ORRICO, Atty. Reg. No. 93303, 900 Baker Building, 1940 East Sixth Street, Cleveland, Ohio 44114
    Attorneys for Plaintiff-Appellant

JONATHAN ZWEIZIG, Atty. Reg. No. 0069381, 18 East Water Street, Troy, Ohio 45373
    Attorney for Defendant-Appellee

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} This matter is before the Court on the December 29, 2017 Notice of Appeal of Mark Perrucci, appealing from the trial court's November 22, 2016 judgment against Perrucci on his complaint "for non-payment of construction repairs" and entering judgment in favor of Connie S. Whittington in the amount of $15,000.00 on Whittington's counterclaim. The trial court also ordered that "the issue of attorney fees be referred back to the Magistrate for further hearing," and that "[t]his is a final and appealable entry." Perrucci's notice of appeal also provides that he is appealing from the trial court's November 27, 2017 Judgment Entry, which awarded attorney fees to Whittington in the amount of $15,926.74. The parties' dispute arose from repairs Perrucci made to Whittington's mobile home after the home sustained water damage.

{¶ 2} Before reaching the merits of Perrucci's assigned errors, we will address Whittington's assertion in her brief that Perrucci's appeal is untimely. We note that the record reflects that after the trial court's initial 2016 decision, Perrucci filed a notice of appeal on December 14, 2016, Miami App. No. 2016 CA 24. As Perrucci asserts in his brief, "[o]n January 3, 2017, this Court issued a Show Cause Order, and on February 6, 2017 Perrucci filed a Motion to Remand for a finding that there was 'no just cause for delay' in response to the Show Cause Order." Whittington opposed the motion. On March 9, 2017, this Court found that the Show Cause Order was not satisfied and dismissed the appeal. This Court determined as follows:

Notwithstanding [the municipal's court's statement that its November 22, 2016 order is final and appealable], it appeared to this court that the November 22 entry was not final and appealable in that it indicated further proceedings would occur on Whittington's request for attorney fees, but did

not state that there was no just reason for delay pursuant to Civ.R. 54(B). Such a determination would allow an immediate appeal of the otherwise interlocutory order. We ordered Perrucci to show cause why this appeal should not be dismissed for lack of jurisdiction.

Perrucci responded to our order by moving to remand to the trial court. He recognized that the trial court did not use the required language in Civ.R. 54(B), but asked that this court remand the case to allow the court to add such language. Whittington opposed the remand motion, arguing that dismissal and return to the trial court is the proper manner to resolve this appeal. Upon consideration, we agree that this matter must be dismissed, but make no determination about what the trial court should do.

{¶ 3} In her brief, Whittington argues that the "last and final Entry in this case was filed on November 27, 2017," and that Perrucci did not file his Notice of Appeal until December 29, 2017, more than 30 days after the November 27, 2017 Entry. As a result, the instant appeal should be dismissed as being untimely filed. Perrucci responds that the November 27, 2017 Entry was never sent to his counsel's office, and "[m]oreover, the clerk has never noted service on the docket, as required by Civ.R. 58(B)." Perrucci argues that on December 29, 2017, his counsel "checked the court docket and became aware that the Entry had been recorded," and "promptly filed a notice of appeal." Perrucci asserts that "[b]ecause the Entry has never been properly served on Appellant and service has never been docketed, the requirements of Civ.R. 58(B) have not been satisfied. Under the rule, the time for Appellant to perfect his appeal was not even triggered at the time the appeal was filed."

{¶ 4} App.R. 58(B) provides:

When the court signs a judgment, the court shall endorse thereon a direction to the clerk to serve upon all parties not in default for failure to appear notice of the judgment and its date of entry upon the journal. Within three days of entering the judgment upon the journal, the clerk shall serve the parties in a manner prescribed by Civ.R. 5(B) and note the service in the appearance docket. Upon serving the notice and notation of the service in the appearance docket, the service is complete. The failure of the clerk to serve notice does not affect the validity of the judgment or the running of the time for appeal except as provided in App.R. 4(A).

{¶ 5} " 'It is the service of notice, and adequate proof thereof, and not actual notice that is required by Civ.R. 58(B).' *In re A.A.,* Cuyahoga App. No. 85002, 2005-Ohio-2618, ¶ 13." *In re B.M.R.,* 2d Dist. Miami No. 2005 CA 1, 2005 CA 18, 2005-Ohio-5911, ¶ 4.

{¶ 6} App.R. 4(A)(1) provides: "Subject to the provisions of App.R. 4(A)(3), a party who wishes to appeal from an order that is final upon its entry shall file the notice of appeal required by App.R. 3 within 30 days of that entry." App.R. 4(A)(3) provides: "In a civil case, if the clerk has not completed service of the order within the three-day period prescribed in Civ.R. 58(B), the thirty day periods referenced in App.R. 4(A)(1) and 4(A)(2) begin to run on the date when the clerk actually completes service."

{¶ 7} Attached to Perrucci's brief is the affidavit of his counsel, Robert D. Kehoe, which provides in part that he entered a notice of appearance on September 18, 2015, and a second notice of appearance on March 2, 2016, adding Lauren N. Orrico as additional counsel, and that pursuant to the notices, "all service upon Appellant was to be

sent to Kehoe's office." Kehoe avers that he never received the Entry of November 27, 2017, and that a "review of the case docket further reflects that the clerk has never noted service on the docket."

{¶ 8} We agree with Perrucci that the requirements of Civ.R. 58(B) have not been met; there is nothing to indicate that the clerk served the parties, and service is not noted in the appearance docket and accordingly is not complete. Thus, the time for filing a notice of appeal has not expired, and Perrucci's appeal is timely.

{¶ 9} We further note that in her brief Whittington asserts that Perrucci's brief should be rejected for failing to comply with Loc.R. 2.2 of the Second Appellate District. That rule provides in part:

(A) No initial brief of appellant * * * shall exceed twenty-five (25) pages in length, exclusive of the table of contents, table of cases, statutes and other authorities cited, and appendices, if any, except by prior leave of the Court. Application for leave to file a longer brief shall be by motion specifying the unusual circumstances which necessitate the filing of a brief that exceeds the limits imposed by this rule.

* * *

(B) Any brief that fails to comply with this rule * * * may be returned by the Court for reformation. * * *

{¶ 10} The body of Perrucci's brief is 32 pages. We note that on March 5, 2018, Perrucci filed a "Motion of Appellant Mark R. Perrucci for Leave to File a Longer Brief or in the alternative for Leave to File an Amended Brief." Therein he argues that his failure to comply with the local rule was an oversight. He also asserts that a longer brief is

necessary because his appeal "stems from two separate trial entries adopting two separate Magistrate's decisions" and "the evidence in this case is unusually extensive as it was admitted over four days of trial." Perrucci asserts that allowing him to exceed the page limit "would serve the interests of justice * * *." We will consider Perrucci's brief as filed.

{¶ 11} Perrucci filed his complaint against Whittington on October 15, 2012, claiming non-payment of construction costs; he also requested attorney fees. The complaint alleged the following facts. Whittington's mobile home, located at 3166 Davis Road in Ludlow Falls, sustained damage due to a water leak inside the residence. Whittington filed a claim with her insurance company, Foremost Insurance ("Foremost"). After Whittington's residence was inspected and Foremost completed an estimate of the cost of repairs, Whittington hired Perrucci to perform the repairs. Whittington agreed to pay Perrucci from the proceeds of her insurance claim, and on June 19, 2012, she endorsed a Foremost check over to Perrucci in the amount of $3,756.51. A copy of the check is attached to the complaint.

{¶ 12} Perrucci began work on the mobile home on June 20, 2012, pursuant to the estimate. Between June 20, 2012 and August 27, 2012, according to Perrucci, Whittington asked Perrucci to make additional repairs not attributable to the water damage, and he did so at her request. Perrucci paid for various materials that were used to repair the residence. On September 18, 2012, Perrucci submitted a final invoice to Foremost in the amount of $8,681.55.

{¶ 13} The complaint states that a copy of the invoice is attached. Attached to the complaint is an 11-page document that provides, "Mark Perrucci – Sani Home" at the top

of each page with Perrucci's address and phone number, as well as his "Tax id" number. The first page of the document identifies Perrucci as the "Estimator," and provides, "**This is the final estimate for the reconstruction at Connie Whittington mobile.**" The final estimate covers repairs to Whittington's hallway, bathroom, laundry room, master bedroom, office, living room, furnace room, and to the underbelly of the mobile home. According to Perrucci, Whittington received an additional insurance payment from Foremost and refused to pay him for the work completed. Perrucci alleged a balance due of $4,925.04. He filed a mechanic's lien on Whittington's property.

{¶ 14} On December 6, 2012, Whittington filed her answer and counterclaim. In her counterclaim, she asserted that the parties did not enter into a written contract. She asserted that Perrucci did not perform the repairs in a workmanlike manner and acted negligently, without the degree of care which a member of the construction trade in good standing would exercise. Whittington asserted that she was damaged in the amount of $15,000.00. Finally, Whittington argued that she was a "consumer," Perrucci was a "supplier," and together they entered into a "consumer transaction" as those terms are defined in the Ohio Consumer Sales Practices Act ("CSPA"). Whittington asserted that Perrucci committed unfair, deceptive and unconscionable acts and practices in violation of the CSPA, including "failure to perform as promised; illustrating a pattern of inefficiency and incompetence; failure to perform in a workmanlike manner; knowing breach of contract; failure to perform in a timely manner; failure to provide all required disclosures; failing to provide proper receipts; and failure to incorporate all required disclosures in the contract." Whittington asserted that she was entitled to treble damages.

{¶ 15} On July 16, 2013, Perrucci moved for summary judgment and filed a

"Memorandum in Support of Plaintiff's Motion for Summary Judgment." On July 25, 2013, the Magistrate issued a decision overruling the motion, noting that the deadline for summary judgment motions was July 15, 2013, and Perrucci had not sought leave to file the motion.

{¶ 16} Perrucci objected to the Magistrate's decision on August 7, 2013. On August 8, 2013, Whittington filed "Defendant's Memorandum in Opposition to Plaintiff's Objections to Magistrate's Decision." On August 19, 2013, the court overruled Perrucci's objections, noting that his motion for summary judgment was time-stamped a day after the deadline, and that since the matter was set for trial, Perrucci had been required to seek leave of court to file the motion, which he did not do.

{¶ 17} The court also noted that Perrucci alleged that the "Magistrate may be engaged in ex parte contact with counsel" for Whittington, and further noted that such "is a serious charge and would clearly be a violation of the Rules of Professional Conduct if true." The court advised Perrucci's counsel of his obligation to "notify the appropriate authorities of these actions," since "failure to do so could be construed to be a violation of the Code." Finally, the court noted that "a spurious accusation by Plaintiff's counsel of such impropriety of the Court would probably constitute a violation of the Rules of Professional Conduct by Plaintiff's counsel."

{¶ 18} On September 20, 2013, Whittington filed a "Motion of Defendant, Connie Whittington, to Deem Allegations of Counterclaim Admitted as True for all Trial Purposes; Motion for Default Pursuant to Rule 55." On the same day, counsel for Perrucci filed a handwritten "Entry," ostensibly allowing Perrucci to file a response to Whittington's counterclaim, and "Plaintiff's Reply to Counterclaim of Defendant."

{¶ 19} Trial of the matter commenced on September 20, 2013. At the start of the proceedings, the Magistrate overruled the Rule 55 Motion. The Magistrate further noted, regarding Whittington's motion to deem the allegations in her counterclaim admitted, that this Court "has a strong, strong, emphasis on * * * encouraging judgment – trial on the merits." The Magistrate accepted Perrucci's reply to the counterclaim. The Magistrate also indicated that the issue of attorney fees under the CSPA would be bifurcated.

{¶ 20} The evidence presented at trial was as follows:

{¶ 21} Counsel for Perrucci called Whittington to testify as on cross-examination. She testified that she sustained water damage after a "fitting had popped apart" in the vanity in the bathroom. She stated that she contacted her insurance company, Foremost, which sent Service Master to her home to remove the water; she also received an estimate from her adjuster to repair the damage. She testified that the final estimate attached to the complaint "could be the one that Foremost made out." The first portion of the estimate covered damage to the hallway of Whittington's home, including the installation of new carpet and padding. Whittington stated that she had to call "Brian," the "carpet man" to return to her home to repair the loose carpet on the day it was installed. Regarding the "underlayment" or sub-floor beneath the carpet in the hallway, which also had to be replaced, Whittington stated that, "when they laid the floor down, the wooden part, it doesn't go underneath my wall, and when you walk, it's like a spring board and if you get too close to the edge, and get to the wall, your shoe will actually go underneath that." Whittington testified that she has "issues with all of my doors," and that "the bathroom door will not shut because the wall is not in line. The bedroom door is doing the same thing because it's hooked to the same wall." Whittington stated that she

did not have problems with her doors prior to the repair work.

{¶ 22} The next section of the estimate covered damage to the bathroom of the mobile home. Whittington testified that the carpet and pad were replaced in the bathroom as well, and "the bathroom carpet is come loose." She testified that she has "like a step-up that you step-up to the toilet. It's on the bottom floor right as – that the step up has come loose." Whittington stated that the carpet came "loose immediately." She testified that "Brian couldn't fix it and [Perrucci] ended up fixing it." Whittington testified that she had the same problem with the wooden sub-floor in the bathroom as in the hallway. She stated that when she "stepped from the bedroom, to the bathroom, the floor would give away [sic]. And it also give away at the back door too." She stated that she used to have a vanity in the bathroom that "was one complete unit with two sinks in it," and that now there is "a countertop that they put on wood and then they put covers, they just put little doors that open and close, there's no vanity, it's just a cover. I don't consider that a vanity." Whittington stated that she "had a double sink and I wanted them. They took them." She stated that Perrucci "touched no part of the shower, no part of the toilet and that all should've been taken out and replaced" pursuant to the estimate.

{¶ 23} The next portion of the estimate covered the laundry room in Whittington's residence, and when asked if Perrucci removed and replaced the paneling as listed in the estimate, she responded that she "did not get new paneling," and that her laundry room was originally in the hallway and "they put it in my bathroom." Whittington stated that her washer and dryer were not properly reset, and "they hooked them up backwards," so that "now when you open the doors, they hit each other." While the estimate covered the installation of vinyl floor covering the in the laundry area, Whittington testified that there

is "no vinyl," and there was "never any of that put down."

{¶ 24} The next section of the estimate covered the master bedroom in Whittington's home. While it provided for the detaching and resetting of the closet doors, Whittington testified that "[t]hey never even took them off." In a section of the estimate covering the furnace room, when asked if the damaged particle board was removed and replaced as provided, Whittington responded that "[i]t was not done." She stated that she signed the initial insurance check over to Perrucci because "he wanted the whole amount to start."

{¶ 25} Whittington testified that in the course of the project, she "never swapped any work out."

{¶ 26} Perrucci also presented the testimony of William Kaska. Kaska testified that he owns "a couple Service Master clean franchises, we clean up fire and water damage." He stated that he has certifications in "water restoration, odor, fire, * * * mold, * * * everything that we need for water and fire damage." Kaska stated that he purchased his first franchise five years ago. He stated that after graduating from college in 1989, he "started out working for a home builder * * * and then ended up starting my own home building company" for eight years. Kaska testified that he did new home construction as well as remodeling, and that he has done hundreds of jobs. Kaska stated that he subsequently "took a job with a company out of Columbus as * * * project manager for a condominium development." He testified that he then "transitioned from construction into remediation, mitigation." In sum, Kaska stated that he has been in the construction trade for 20 - 22 years.

{¶ 27} Kaska stated that he met Whittington when "[w]e were called to her house

after she had a water leak," and "we * * * got the mobile home all dried out." Kaska testified that the mobile home was older and in "average at best" condition. He stated that he was not involved in any construction at the property, but that he was there in late August "hoping to maybe help both parties come to a resolution." Kaska testified that the "house looked like it was put back together, it had new furniture, everything looked good." Kaska testified that Whittington complained that the carpet installer did not use tack strips, and "the carpet installer pulled the carpet back in multiple places. And there was tack strip everywhere." Kaska testified that when he observed the mobile home in August, "the areas that were repaired were in better condition than the rest of the home."

{¶ 28} When counsel for Perrucci asked Kaska if he considered himself to be an expert in construction, counsel for Whittington objected, and the Magistrate sustained the objection, noting that Perrucci did not designate Kaska as an expert prior to trial.

{¶ 29} On cross-examination, Kaska testified that he has known Perrucci since 1995 or 1996. When asked if he knew Perrucci to be a contractor by trade, Kaska replied, "Mark [Perrucci] does several things, * * * I think his * * * bulk of his work now is * * * information technology or something to the effect." The following exchange occurred:

JONATHAN ZWEIZIG: You were the one who initially recommended Mark and set Mark up with Connie, correct?

WILLIAM KASKA: I didn't recommend him, I – I introduced the two[.]

JONATHAN ZWEIZIG: Well then tell me who else you introduced Connie to besides Mark?

WILLIAM KASKA: I – I didn't introduce them. I said here's an

individual that I use[,] if you talk to him and you're comfortable with him, I think he would do a good job. * * *

JONATHAN ZWEIZIG: You don't think that's recommending if you say I think he'll do a good job, I think you should call him?

WILLIAM KASKA: No.

JONATHAN ZWEIZIG: * * * How many other names did you give to Connie of people she should possibly contact?

WILLIAM KASKA: Just that one because she didn't ask for any others.

* * *

JONATHAN ZWEIZIG: How many contractors do you regularly work with?

WILLIAM KASKA: Lots.

JONATHAN ZWEIZIG: Did you think Mark was capable of doing this job?

WILLIAM KASKA: Yes.

* * *

WILLIAM KASKA: Did Mark tell ya I can do this type of work? If somebody needs work, let me know?

JONATHAN ZWEIZIG: Um, he's not actively looking for work. Um, it was just there and he's – you know he has the expertise to do it.

{¶ 30} Shawn Allamon testified that at the time he worked on Whittington's home, he had been in the construction business for 17 years. Allamon testified that he met

Kaska at Whittington's home at Kaska's request. Allamon testified that when he investigated and photographed the property, he noticed that "there was improper footing under the trailer," and the "foundation footers" were "tilted, sagging." He stated that the "trailer had been settling for many years," and "nothing was level going underneath." Allamon identified several photographs of the property taken by him prior to the mitigation and repairs and in the course thereof. Allamon identified as Exhibit 18 a photograph taken by him of a "footer under the back of the trailer * * * directly by the bathroom door underneath" that is at an angle. He identified Exhibit 14 as a photograph of "the cluttered path going through the underside of the porch to the access to under the trailer." Allamon testified that the photograph depicts "improper insulation just laying around." Allamon testified that Exhibit 16 depicts "a path to * * * the other side of where the source of the water came from the trailer, the bathroom. This picture was taken due to exposed electric wire lines being buried underground, disconnected duct work. Cable lines being saturated under the ground."

{¶ 31} Allamon testified that Exhibit 10 depicts the washer and dryer in the hallway, and he testified that they "were tilted backwards and the reason this was taken because the * * * washer and dryer had already been propped up due to saturation prior to * * * this water mitigation problem. So it had been addressed prior to." Allamon testified that Exhibit 15 depicts a dry, raised area in the bathroom "that became a storage spot for * * * knick-knacks and odds and ends." The photograph also depicts the sub-floor in front of the raised area, after the carpet and pad were removed, along with fans to dry the floor. Allamon testified that Exhibit 12 depicts a dehumidifier in front of the "the back side of the washer and dryer wall." Allamon testified that Exhibit 11 depicts "where the source came

from of the busted water line" under the vanity in the bathroom. Allamon testified that Exhibit 17 depicts a hole in the floor in front of the furnace room, next to the bathroom. He stated that "you can see my foot where the water came out of the bathroom and * * * traveled down a valley through the travel path of the floor, and most of the water went down through this hole." Allamon testified that Exhibit 13 depicts the bathroom before any mitigation or repair.

{¶ 32} Allamon testified that he performed the mitigation at the trailer, and he "was sub-contracted through Mark [Perrucci]." He testified that when he arrived, the water had been shut off, and "there was no standing water, there was water saturated where the carpet had been." Allamon testified that he performed 75 percent of the repair work at the mobile home. He removed the saturated carpet, pad and linoleum in the hallway and bathroom. Allamon testified that the existing subfloor "was swollen and the areas that had been affected by the water mitigation at that point, prior to that you could see swelling throughout it, rolling." Allamon testified that there "had been cupping between the floor joists." He stated that the subfloor was "pressboard," and that after removing it, he installed "3/4 inch tongue and groove * * * sheeting, OSB." He stated that he "did it in the bathroom and the contaminated area. * * *." Allamon testified that he did not lift or move the exterior wall when installing the sub-floor in the hallway because it provided structural support for the trailer. He testified that none of the interior walls were load bearing walls. Allamon acknowledged that there was a gap between the new subfloor and the wall, and that "you have to build up to it to make it level." He testified that he used a "ledger board," and the sub-floor "was glued and screwed to the ledger board." He stated that the process is "typical in a restoration job."

{¶ 33} Regarding the flooring in the bathroom, Allamon testified that "the first part of getting the flooring installed correctly is, we had to remove the bath tub." He stated that the tub was reset after the flooring was replaced, and that the "partition wall on the back side of the laundry room was removed." He testified that when he completed the job the tub was in proper working order, and that he "went over and above on that." Allamon stated that the raised area in the bathroom, as depicted in Exhibit 15, "was in an unaffected area," where the toilet was. He stated "there was a working toilet the whole time we was there." He stated that the photo depicts the perimeter of water damage on the floor, that "there was no saturation up to that landing," and that there was no mitigation done there. Allamon testified that the shower area is also on the raised area, and he stated that he did not remove or detach the shower because he "had no reason to." Allamon stated that there was a double sink, and that the vanity was "a split door with a pull-out dated, it was * * * a base with * * * a plastic top." In the area of the vanity, Allamon testified that once the vanity was removed, he "undercut all of the sub-floor and put new floor up under that partition wall." According to Allamon, "we slid [the sub-floor] under the wall." Allamon testified that when he installed the new sinks, he gave Whittington the "option of replacing the fixtures and I re-used her old fixtures." He stated that the vanity top did not have any water damage. He testified that he replaced four shut off valves in the bathroom. Allamon testified that they were replaced "because they were dated and that was the source of the problem."

{¶ 34} Regarding the furnace room, Allamon testified that the furnace "was dis-attached, out of the room, which exposed the floor. The floor was taken out. There was a plenum tray in there that it mounted to that was completely rotted and rusted. Once we

removed that, * * * all the anchoring places to put a new floor in was obsolete." Allamon stated that he "made all new mounting brackets, ledger boards, if you will and bracing to properly install a new sub-floor."

**{¶ 35}** Allamon testified that the job took three weeks to complete. He stated that he spoke to Whittington and "Doug," a "gentleman" who was often at Whittington's home, daily in the course of the project. He testified that he offered alternatives to them and testified that "[s]omethings [sic] could be a supplemental bill, somethings [sic] could be traded off for other things. So throughout this whole process, it was a day-to-day conversation with Connie that * * * everything that I did was revised with her." According to Allamon, in his experience, "there's no job that you'll get an estimate that goes back exactly the same as the estimate."

**{¶ 36}** Allamon testified that there was a "supplemental bill to re-route the water lines further on down more fittings" [sic] when the washer and dryer were moved. He stated that there was "only one point in time that I remember ever hearing that there was a problem about it and it was at the very end of the job when I came back, * * * there was a complaint and * * * we * * * switched around and put hoses for her on there." Allamon testified that Exhibit 16 accurately depicts the original dryer vent hose hanging under the mobile home, and he testified that he "reattached a brand new * * * flex duct and actually ran it to the skirt * * * that runs around the trailer so it properly vents outside."

**{¶ 37}** Allamon testified that he put R 38 insulation under the mobile home, along with a moisture barrier. When counsel for Perrucci asked Allamon if he repaired and installed the materials in a reasonable and ordinary fashion customary to his experience in the industry, counsel for Whittington objected, and the Magistrate indicated that

Allamon "will not be considered an expert since he had not been disclosed." When asked if he did good work on the property, Allamon responded, "from day one the job was a task due to being an older home, every single thing in this property, I had to modify mounting positions, I had to use extra bracing, extra brackets, * * * glue, screws, longer screws, * * * so I feel that I went over and above just a normal standard procedure of replacing as of that quality for restoration purposes."

{¶ 38} The following exchange occurred:

CHRISTOPHER PERRUCCI:  * * * Based upon the work that you installed and done, and had done there, is there any reason why you would believe that that work needs to be redone?

* * *

MAGISTRATE:  Hold on a second sir.

JONATHAN ZWEIZIG:  Just again for the record what they're utilizing is my expert's reports to the extent, again, they're trying to utilize a lay witness testimony to contradict what my expert's gonna come in here and say.  I just want the Court to be mindful that again this individual has not been classified or qualified as an expert witness.  So if that's the path we're going down, I at least want to make an objection.

MAGISTRATE: * * * This is the report done by an expert of yours?

JONATHAN ZWEIZIG:  Correct Your Honor.

* * *

MAGISTRATE:  I don't know that, Mr. Perrucci, I don't know that I, if you're going to cross examine him as a lay person with an expert, I think

you're kind of going into a darker area that probably if Mr. Zweizig objects, I would be inclined to sustain.   If he wants to say, we'll [sic] I've done this, or done that, I guess he could do that.   But if he's going to comment about what the expert specific findings were in an attempt to contradict them in terms of kind of as an expert that I cannot allow.

CHRISTOPHER PERRUCCI: * * * I was simply trying to, since he is the contractor that installed and did the work, that I thought he would be in a position to identify the items on there that he did , that he believed needed to be repaired.   I mean, he has first-hand knowledge. * * *

JONATHAN ZWEIZIG:   And Your Honor if he had been identified as an expert, I sure would have taken his deposition.

MAGISTRATE:   * * * [I]f it's an objection I would probably sustain it again because what you're doing now, is you're going into him effectively commenting as an expert about another expert's report. * * * I don't believe that I could really permit that.

{¶ 39} On cross-examination, Allamon testified that he did not have the final estimate "in my possession and I got what to do from [Perrucci]."   Allamon testified that he did not obtain any written "change orders" for the project from Whittington.   He stated that he worked alone on the job most of the time.

{¶ 40}  Michael Laughlin testified that he is employed at Foremost and was Whittington's assigned adjuster. He testified that he "put together my initial estimate for * * * what it would take to rebuild and replace what was water damaged."   Laughlin identified the final estimate as an estimate prepared by Perrucci. Laughlin testified that

he did not see Perrucci's estimate until the work was complete. Laughlin identified a copy of the initial check made out to Whittington on the project. He testified that he returned to the property after Perrucci indicated that the project was complete, at the end of August 2012. At the time, Whittington indicated to Laughlin that she was not happy with the work performed. Laughlin testified that he thought the quality of the work was poor. He stated that there were several places along the wall where the floor was "very soft where you could stick your hands down * * * at the base of the wall into the floor a little bit." Laughlin stated it was "almost like it had been before the loss where the particle board was just soft and deteriorated." Laughlin testified that the bathroom countertop was new and "it was crooked." Laughlin stated that the countertop "pushed out the hallway wall which made the door crooked." He testified that after the project was completed, the tub was not level but rather "tilted down towards the outside of the home." He stated that there was an area "between the bath and the shower where you could stick your hand through the floor by the step."

{¶ 41} Laughlin testified that the flooring in the furnace closet was saturated with water, and after it was replaced, "the sub floor didn't seem to be holding completely level and sturdy but then there was also a hole in the wall." Laughlin testified that he felt as though he could possibly fall through the floor.

{¶ 42} On cross-examination, Laughlin testified that he issued a final check to Whittington to close the claim in the amount of "roughly $3,800.00."

{¶ 43} Mark Perrucci testified that he worked full time in construction for about six years, after working as a paralegal and owning a medical billing company. He stated that he also worked for the Redding Construction Group over the summers while in

college and for a little bit after college. Perrucci testified that he currently owns a business called Sani Home, and that he "sell[s] sanitizing products to the schools, nursing homes, individuals." In addition, Perrucci testified that he is employed as a subcontractor for "a company called SLI On-line," and that he does "a lot of criminal research/civil research for them." Perrucci stated that he occasionally does a construction job.

**{¶ 44}** Perrucci testified that he had no construction jobs in 2013, he had one construction job in 2012, namely Whittington's mobile home project, and one construction job in 2011. Perrucci stated that his area of skill is "general framing and interior trim" and finish carpentry.

**{¶ 45}** Perrucci testified that when he went to Whittington's home for the first time, he asked her if she had a construction estimate, and she provided one for him. He stated that he advised her that he "wasn't a full-time construction carpenter. Didn't have a company." He stated that he told her that he "[d]idn't have any worker's comp. Didn't have any liability insurance. And * * * I wasn't bonded, but I could do the work." Perrucci testified that when he and Whittington walked through the mobile home, she asked him if he could move the washer and dryer into the bathroom. Perrucci testified that the basis of the work he performed at the home was the "insurance estimate." He stated that Whittington provided him with a Foremost check at their initial meeting that was payable to her. He stated that there was no written contract between him and Whittington.

**{¶ 46}** Perrucci testified that Allamon did the majority of the work at the project, and that he stopped by every couple of days to check on Allamon's progress. According to Perrucci, "we every step of the way, we made sure that Connie was happy with the work that was being completed." He testified that in addition to Allamon, "Brian" installed

the carpet, and Rob Yorky "did the HVAC." Perrucci testified that Whittington's boyfriend was present every day in the home.

{¶ 47} Perrucci testified that the original sub-floor in the mobile home was particle board, and that it was replaced with three-quarter inch tongue and groove plywood. According to Perrucci "[y]ou remove the sub-floor from the top of the floor joists, you take it out wherever it's under the walls, you have to remove under the walls, if there's nails, you have to pull the nails out and then you start installing the sub-floor." Perrucci stated that it is a common practice to cut along the walls when removing sub-floor.

{¶ 48} Perrucci testified that the initial estimate provided to him did not include work in the living room, the master bedroom, or the office, but only the hallway, bathroom, furnace room and laundry room. He testified that he replaced the sub-floor in the areas where damage was indicated in the initial estimate. He testified that his installation of the sub-floor was reasonable and typical of other installations.

{¶ 49} Perrucci testified that the walls to the laundry room were interior walls within the bathroom, and there was an opening into the hallway. He testified that the laundry room walls were removed, and the washer and dryer are now inside the bathroom.

{¶ 50} When asked about the interior wall of the trailer that runs along the hallway, Perrucci stated that the wall was not lifted and that he installed subfloor a "little bit underneath the wall." He testified that the sub-floor was removed by cutting along the wall joint by means of a saw, and that Allamon then built a ledger board to "carry the load of plywood that didn't attach to the other floor joists and it made another floor." He testified that the ledger board served the purpose of a floor joist. He testified that in the furnace room, which is framed by three walls, there "was no way to get [the subfloor]

under the furnace room," so the original particle board was removed, and a ledger board was created, and the new plywood was placed on top and secured to the ledger board."

{¶ 51} Perrucci testified that the bathroom tub was removed and sub-floor was replaced to the wall area, and then the tub was reinstalled. He testified that the shower and the toilet were on the "step-up" area in the bathroom. When asked if the step-up area was damaged by water, Perrucci replied, "not that I could tell." Perrucci testified that new paneling was installed in the bathroom, and that it was "[t]op of the line, oak." He testified that "Doug" selected the paneling and Allamon installed it. Perrucci testified that the original vanity was not four-sided but that the interior of the vanity was composed of the bathroom walls. He stated that it was supported by a "ledger system." Perrucci stated that he "bought two cabinets and tore them apart, and put the face together" to replace the original vanity and put in a new ledger system. Perrucci stated that the final estimate did not call for a new vanity top, but he "asked Connie if she would like a new vanity top and she said yes."

{¶ 52} Perrucci identified the final estimate as "the estimate that was provided to me by Connie." The following exchange occurred:

CHRISTOPHER PERRUCCI: Okay and we've been using that throughout the proceedings * * * both in your deposition and we attached it to the complaint as the document that describes and defines the work that was done. Does that sound right?

MARK PERRUCCI: Yes. Yes.

{¶ 53} Perrucci testified that a new piece of flooring was placed under the tub, and that he supported the seam between the new plywood and the middle of the door

jamb by going under the trailer and building a "support system that would help that seam stay in place." According to Perrucci, since he "did not remove the toilet, and I did not remove the shower because I saw no water damage, we swapped out those two pieces for the labor and the time and material to put the laundry in the bathroom." He stated that Whittington "was happy that we were there, she was happy with the quality of the work."

{¶ 54} At his final meeting with Whittington, however, Perrucci testified that she "seemed to be generally unhappy." Perrucci identified as Plaintiff's Exhibit 60 in part as a Chase receipt dated August 27, 2012, reflecting a withdrawal from his checking account in the amount of $360.00, with handwriting that provides "$240.00 to Doug Whittington job." Also on Exhibit 60 appears the following handwritten list, according to Perrucci's testimony: "Adjust the main door in the bath. Adjust the master bedroom latch. Lowered the receptacle, creak in the floor, tack strips were okay, side splashes she did not want. And a longer [washer hose drain]." Perrucci stated that the list reflects "items that she was unhappy with during that last meeting." He stated that "Doug was hired to finish that work." Perrucci stated that he hired Doug and paid him $240.00. Also reflected on the list is "squeak in floor," and Perrucci testified that he "did go under and fix the creak in the floor, it's just * * * when I put the 2x4s underneath there, and I put the structure in, I put a 2 x 4 and brought that down to the ground for more support" in the area of the step-up in the bathroom. Attached to Exhibit 60 are several receipts from Lowes and Menards, and Perrucci testified that they reflect materials he purchased for the Whittington project.

{¶ 55} Perrucci stated that the mobile home was in poor condition when he initially

arrived there. He stated that after he completed the project, the area that he was responsible for was in good condition. He stated that he was not hired by Whittington to remodel her mobile home but to perform remedial work relative to her insurance claim for water damage.

{¶ 56} On cross-examination, Perrucci testified that when he reviewed his deposition, he noticed errors in his testimony, but that he did not make any effort to notify the court reporter. The following exchange occurred:

JONATHAN ZWEIZIG: * * * Do you remember my taking your deposition and asking you about how many jobs you've done in the past three years?

MARK PERRUCCI: Yep.

JONATHAN ZWEIZIG: What was your response?

MARK PERRUCCI: I believe I said 30 or 40.

JONATHAN ZWEIZIG: * * * So today, you've two jobs in the last three years. In June when I took your deposition, it was 30.

MARK PERRUCCI: Correct.

JONATHAN ZWEIZIG: * * * In June when I took your deposition, you testified you'd averaged one construction job per month for the past three years.

MARK PERRUCCI: I don't recall that.

* * *

JONATHAN ZWEIZIG: I asked you on Page 8, "are you regularly engaged in the business of doing construction work?" Page 9, your answer

"regularly" with a question mark.   Question, "I mean you don't do this once a year?"   Your answer, "no."

JONATHAN ZWEIZIG:   You've testified now three times that you've done it, either zero times a year or once a year since you've been on the stand, correct?

MARK PERRUCCI:   Correct.

JONATHN ZWEIZIG:   But at your deposition, you've told me you've never done just once a year.

MARK PERRUCCI:   Made a mistake.

* * *

JONATHAN ZWEIZIG:   And you have a bank account established for your construction accounts, correct?

MARK PERRUCCI:   No.

* * *

JONATHAN  ZWEIZIG: * * * Page 17, I'm asking about your corporation -.

MARK PERRUCCI:   About Sani Home.

JONATHAN ZWEIZIG:   I'll ask the question.

MARK PERRUCCI:   Okay, sorry.

JONATHAN ZWEIZIG:   Did it do the work on the home, or did you do the work on the home?   Your answer, "I did the work on the home." "Sani Home's is a company that I run, that had a bank account established." Question, "just for this project, or for your construction projects?"   Answer,

"no it was for construction projects." Correct?

MARK PERRUCCI:   Correct.

JONATHAN ZWEIZIG:   You're a contractor by trade, correct?

MARK PERRUCCI:   No.

JONATHANN ZWEIZIG:   This is what you do correct?

MARK PERRUCCI:   No.

JONATHAN ZWEIZIG:   Sir are you trying to tell this court that this is not what you do just so you can avoid the Consumer Sales Practices Act? Is that what this is?

MARK PERRUCCI:   No.   I'm not a contractor.   I'm no longer a full-time contractor.

JONATHAN ZWEIZIG:   But sir I'm not asking you what you are today, I'm asking when you did the work, you were a full-time contractor, correct?

MARK PERRUCCI:   No.

JONATHAN ZWEIZIG:   You did a job one on one on these projects?

MARK PERRUCCI:   I was mistaken.

JONATHAN ZWEIZIGG:   And you testified today as if you've been there a lot and you've done a lot of the work, correct?   You've used "we" all the time in your prior testimony correct?

MARK PERRUCCI:   Today's testimony?

JONATHAN ZWEIZIG:   Correct.

JONATHAN ZWEIZIG:   Yeah, I guess, we.

JONATHAN ZWEIZIG: Do you remember testifying in your deposition that Shawn did 80 percent of the work?

MARK PERRUCCI: Sure.

JONATHAN ZWEIZIG: Do you remember testifying in your deposition that Rob did 10 percent of the work?

MARK PERRUCCI: Yeah.

JONATHAN ZWEIZIG: And that the carpet guy, did ten percent of the work?

MARK PERRUCCI: Yep.

JONATHAN ZWEIZIG: That's 100 percent of the work, correct?

MARK PERRUCCI: Correct.

{¶ 57} Perrucci testified that he received $3,756.51 for the project, and that he was seeking, in addition to attorney fees, the difference between what he was paid and the contract price of $8,681.55. Perrucci testified that in September 2012, he signed an affidavit for a mechanic's lien under oath, and that the number reflected on his affidavit is not correct. He testified that there is not a signed contract or a signed change order from the Whittington project.

{¶ 58} Perrucci acknowledged that the final estimate provided for blown-in insulation under the mobile home, but that he did not blow in any insulation. Perrucci testified that he did not provide Whittington with a list of the sub-contractors he intended to use on the project or with the warranties on the insulation. He stated that he did not provide in writing to Whittington whether he was insured under worker's compensation or whether he met applicable licensing and bonding requirements. He stated that he did

not provide a written estimated completion date. He stated that he did not provide in writing the type and brand of insulation he intended to use. He stated that he did not provide Whittington with a statement of her legal rights. He stated that, after the insulation was installed, he did not provide Whittington with a "consumer information card." Perrucci testified that he installed the vapor barrier and the insulation himself, that he told Whittington that he was not going to use "blow-in" insulation, and she "was fine with it."

{¶ 59} Perrucci testified that he does not know what a "shear wall" is, or if the mobile home had any "shear walls." Perrucci testified that he advised Whittington that he did not have any employees, but that he had a list of sub-contractors that he used regularly. Perrucci testified that he pushed the sub-floor under the interior walls of the home with "your feet and a sledge hammer." He stated that to remove the original sub-floor, "[y]ou chisel it out with a chisel and a hammer." When asked about nails under the wall, he testified that "you clip the nails off with a pair of dykes." According to Perrucci, "[o]nce the surface is clean, it allows you to put a new surface in there." Perrucci acknowledged that the final estimate called for lifting the walls, and that he did not do that. He stated that he did not advise Whittington that he did not intend to lift the walls as provided in the final estimate. Perrucci denied moving the laundry room wall because it was easier to install the sub-flooring there without having to chisel it out from that wall. He stated that he does not know who the manufacturer of the mobile home was. Further cross-examination of Perrucci was then suspended to allow for the testimony of James Hellman, Whittington's expert witness.

{¶ 60} James Hellman stated that his grandparents owned 18 apartment buildings,

which his grandfather maintained, and that he began helping his grandfather as a boy. Hellman testified that when his grandfather died, he maintained the buildings. He stated that by "the time I was 14, I dug, framed and poured my first porch for some people down the street. By the time I was 16, I built my first garage." Hellman stated that he built his first house in 1990. He stated that in 2000 he started his own company, and that he "can plumb, I can do electric, my expertise is great in carpentry work, that's what I do the best. But I have a general knowledge of all because like I said I built houses and everything else, so." Hellman stated that he has owned Dunn Well Construction since 2000. He indicated that he has testified as an expert in the municipal court over a contractor dispute. Hellman indicated that when he was retained to investigate Whittington's mobile home, he did some preliminary investigation as to mobile home construction and renovation, and he stated that the Ohio Manufactured Homes Commission in Columbus "set the guidelines of structure on mobile homes along with housing and urban development. And they have strict guidelines to follow." He stated that he prepared a report in the course of his investigation.

{¶ 61} Counsel for Perrucci objected, asserting that Hellman "has no first-hand knowledge about what's quoted as the work that Mark Perrucci did. His review of the work was in February. Mark's crew was out of there in August." The court overruled the objection. Counsel for Whittington then asked the court to recognize Hellman as an expert witness, noting, "[m]y understanding in Chambers that opposing counsel wants to take some time to examine."

{¶ 62} Counsel for Perrucci then examined Hellman as on cross-examination on the issue of whether or not he was qualified to testify as an expert. Hellman indicated that

he did not attend college or take any classes in structural engineering. He stated that he has a State of Ohio general contractor's license, registered in Montgomery County. Hellman stated that he has built four custom homes. Hellman stated that he is not a licensed plumber or electrician, "but the issues here aren't electrical or plumbing, it's all carpentry." When asked about his formal education in carpentry, Hellman replied, "I did all of the classes in high school and like I said, I've been doing this since I was little boy, I think that pretty well qualifies it." He stated that he has 40 years of experience as a carpenter.

{¶ 63} The following exchange occurred:

CHRISTOPHER PERRUCCI: * * * And * * * you've recited some statements about HUD and also about * * * the manufacturer of housing commission here in Ohio. Do you know what those things apply to?

JAMES HELLMAN: They apply to manufactured homes, such as pre-fab or mobiles and there's specific guidelines spelled out from both of them of how they're supposed to be.

CHRISTOPHER PERRUCCI: And do you know when the HUD guidelines came into existence?

JAMES HELLMAN: That I can't tell you, but I have a copy of those.

CHRISTRPHER PERRUCCI: If I told you that it applied to mobile homes manufactured after 1974, would you have any reason to think that's inaccurate?

JAMES HELLMAN: Wouldn't matter, this home was manufactured in '89.

CHRISTOPHER PERRUCCI:   And how do you know that?

JAMES HELLMAN:   Well I'm going by the owner's recollection of how old the house is.

CHRISTOPHER PERRUCCI:   Okay, but do you have any personal knowledge of when the mobile homes [sic] was manufactured?

JAMES HELLMAN:   I do not.

**{¶ 64}** Counsel for Whittington resumed his direct examination after the trial court declared Hellman an expert.   Hellman testified that he visited Whittington's home on February 11, 2013.   He stated that he then reviewed the final estimate, to review what was quoted compared to "what actually happened."   Hellman identified his report of March 21, 2013.   The report initially provides as follows:

* * * The complaint was about the work done on the home by a Mark Perrucci – Sani Home, due to water damage caused by a shut off valves [sic] coming off a water line in the bath room. Using their write-up I will address my findings.

Page 1:   Main Level Hallway

They were to lift the wall and replace the damaged particle board.   This did not happen.   Instead they cut along the walls and replaced accessible particle board.   Also on this page they mentioned the missing wall for the laundry room they installed wall in a different location than was originally. This is unacceptable because in a mobile home or a pre-fabricated structure they are engineered to be in a specific location for strength and stability and moving this is structurally unsound.   Sani Home claims they move to meet

code, there is no code that will change a structural design on a mobile or pre-fab home.

{¶ 65} Hellman testified that he "contacted the manufacturer and * * * they assured me you cannot push on the ceiling of these things" to lift the interior walls. He stated that if you replace subfloor under a shear wall, "you have to block the ceiling, you can't put pressure on it, take that wall down and they fix the floors and then replace that shear wall. What I saw in here, it was cut along those walls, and the boards were pulled out and replaced up to the wall. There was no sign of putting wood underneath * * * these walls." When asked if he observed evidence that damaged sub-floor had been chiseled out from under the walls, Hellman responded, "you can't chisel that wood out from under there for two reasons. It's glued and screwed down."

{¶ 66} Regarding the wall that was moved for the laundry room, the following exchange occurred:

JAMES HELLMAN: Mentioned wall for laundry room, they installed wall in a different place. Now if they did not contact the manufacturer of this home, the wall that they moved, may or may not be a shear wall and unless they know where that shear wall is and what the shear wall is, it can't be moved. And that's for structural reasons. * * *

MAGISTRATE: Let me ask you a real quick question. * * * Is this a shear wall, or do you not know?

JAMES HELLMAN: Do not know, I never questioned the manufacturer to it being a shear wall or not. That changes per model per trailer manufacturer.

MAGISTRATE:   So in other words, it may be okay, it may not be okay if its –

JAMES HELLMAN:   Correct but the comment was made to me that this wall was moved due to a code.   There is no code anywhere in this state that says an existing wall has to be moved.   Now if it was an addition to this property, then yes it has to be brought up to standard code.   But if it's an existing wall, it is not to be moved by code.

* * *

{¶ 67} The next paragraph of Hellman's report provides as follows:

Page 2: Bathroom

Sani Home was to remove the tub & shower to remove the damaged floor and replace with new.   They did not remove the shower and as far as the tub goes, they may have removed but they left a big hole in the floor * * *. I don't know of any house that you can see the ground underneath through the floor.   Also they took her vanity top and replaced it with one that is too small so they tried to cover this up by using a ton of caulk and poor trim work.   I could go on about the finish work in the bath, but it would be more of the same – poor in every respect.

{¶ 68} Another section of Hellman's report provides as follows:

Page 6:   Living Room & Furnace Room

All were supposed to have the floor removed, lifted and replaced in all of these locations.   The floor was cut along the walls and replaced where accessible.   Also the duct work for the furnace is very poor and the furnace

floor is already sinking * * *.

{¶ 69} Hellman testified, "I don't understand why they cut into the duct work for the furnace because if it would've went back right where it was it should've been no different than what it was. And these things are designed to be a specific way. And they don't need to be changed." Hellman testified that "materials haven't changed since this thing was built that you can't get the same * * *."

{¶ 70} Hellman testified that when he walked through the mobile home, the floor "was springy * * *." He stated that "in replacing the sub-floor, * * * they cut down along the walls so it was pieces. Everything was pieced together." According to Hellman, "you can feel [the floor] give." When asked if he would have expected the floor to be "springy" if the entire subfloor was replaced, he replied, "[a]bsolutely not because subfloors and especially in trailers - * * * every sub-floor is glued and screwed down."

{¶ 71} The final section of Hellman's report provides as follows:

Page 7: Underbelly

Sani Home was supposed to insulate and install a vapor barrier. This was done in as poor a manner as possible. There are a lot of areas that are not even insulate[d] or covered with the proper vapor barrier but most of all the bottom should have been covered with Celatex. Celatex is used on the bottoms of mobile homes to keep out bugs, mice and other small critters. * * *

{¶ 72} Hellman testified, "I'm going strictly off of what their quote said they would do, and when I got there, it was not done. I mean, according to their quote, they were going to insulate it, fix the vapor barrier, and take it back to where it was. And that was

not the case." Hellman testified that the vapor barrier and insulation were "hanging down." Hellman testified that a vapor barrier cannot be installed from inside the mobile home.

**{¶ 73}** In summation, Hellman testified that "when you tell somebody you're going to lift the walls and replace the floor and you can't lift the wall then you're not doing what you said you would do. If you say you're going to get under this thing and you're gonna put all of this under it, but you didn't get under it, you didn't do it."

**{¶ 74}** Hellman identified an estimate he prepared as part of his report to repair the mobile home, for a total cost of $11,029.61. The estimate provides:

> Dunn Well Construction will remove: all carpet and pad; wall paneling, baseboards; door casings; furnace; shower; tub; vanity; wall built by Sani Home; and all sub-floor. * * * Dunn Well will make every effort to remove these items without damage and save them for re-installation, but that may not be possible based on how they were installed. Dunn Well will: replace all sub floor in the proper manner; rebuild wall back to its original location; re-install furnace, shower, tub & vanity; re-connect all electrics, water and furnace runs.

> Dunn Well will lay new underlayment for vinyl in laundry room then install new vinyl. Dunn Well will hang new paneling, reinstall carpet pad & carpet, hang doors, install all baseboards and door casings. Dunn Well will then go under the home insulate properly then cover bottom with Celatex to prevent any small animals from entering the home from underneath.

**{¶ 75}** When asked if the charges reflected on his estimate are "all reasonable

and necessary," Hellman responded, "Well I would say after doing more investigating on this matter, it's probably on the low side, but with * * * current pricing going now with lumber and everything else, I would say it's pretty close."

{¶ 76} On cross-examination, Hellman testified that the walls in the mobile home were screwed and glued in, so that even if you remove the sub-floor, you cannot slide new sub-floor in place under the wall due to the presence of the screws. He stated that the mobile home was manufactured in 1989, and at that time the screws were required by the "structural design code published in 1976." Hellman stated that there appeared to be a gap of a quarter inch on each side of the new vanity. He stated that the hole under the tub is visible when the access panel to the tub plumbing is removed.

{¶ 77} Testimony resumed on December 17, 2013. Whittington was called on direct examination. Whittington stated that she and her husband initially moved into a 1970 mobile home on the property, and that they purchased the current mobile home in 1990. She stated that she signed the initial insurance check over to Perrucci pursuant to the final estimate, and that the final estimate reflected "what it was going to cost to have the whole place done," namely $8,681.55. Whittington stated that she received a second check from Foremost, and that she signed it over to her attorney and did not use it to purchase anything.

{¶ 78} When asked about Perrucci's workmanship, she testified that if you walk on the floors, "they bounce." According to Whittington, "You go along the edge and your foot will actually go into the side of your sole of your shoe will hook in between the baseboard because they do not connect to the walls." She testified that her "doors won't shut. The walls are out of line." She stated that the "the door that goes to the bathroom

does not close because the door is not in line." She further testified that a "problem I'm having with the carpet isn't the carpet man, it's because the carpet has nothing to hook to, there's too much gap so I just go along and take a putty knife and tuck it all back in all the time * * *."

{¶ 79} Whittington stated that there is a three-foot long and one-and-a-half inches-wide hole under the bath tub behind the access panel, and that Perrucci "did not finish the flooring." Regarding the shower floor, Whittington testified that "the floor was not replaced and that was right there at the main break where the water line broke." She stated that "it's eventually going to fall through because it's – you can feel it when you walk in it." Whittington stated that she "asked them about it and they said it didn't need to be taken out and this is the way that it is."

{¶ 80} On cross-examination, counsel for Perrucci referred to the final estimate as "the estimate from the insurance company." Whittington acknowledged that the final estimate does not list work for the master bedroom door, and she testified that "it wouldn't be because the wall was still here then, you guys took the wall out and when you put the wall back in that's what set the door off."

{¶ 81} Whittington stated that in August, 2012 she asked Perrucci to discontinue the project and not return to her property. She stated that "they asked me what it would take, for me to be happy. I said * * * to take my floors, do them right, so when I walk on them, they don't bounce, get my walls back in line, they said they couldn't do that. So I asked them to leave." When asked if Perrucci hired Doug to finish the project, she replied that "that has nothing to do with me" and that she did not hire Doug. She testified that Perrucci handed her $240.00 and "told me to keep it, to take and have it for Doug to

turn that around." She stated that she gave the money to Perrucci, and "he threw the money on the table, and before I got it all collected, he was gone."

{¶ 82} Whittington stated that her washer and dryer are boxed in and an electrician and a carpenter are required to remove the wall to get them out of the bathroom. She stated that she did not want them in her bathroom, and that Allamon "brought me in the house, told me that the bathroom could not go back the way it was, because of code." Whittington testified that the floor under the doorway of the master bedroom into the bathroom "fell through" under the carpet, that she fell in that area, and that Doug "patched it."

{¶ 83} Whittington stated that she has not paid for any repairs since Perrucci left her home. She stated that she gave Perrucci "many opportunities to come out there to * * * fix what was wrong, but it was always this is the way that it is. * * * He did go underneath and he did make that where the bathroom with the step-up to the toilet is, he did go underneath there and put a board and two things down to the ground, but – he calls that fixed."

{¶ 84} Whittington testified as follows about her new vanity:

It's worse. It's got the wall bowed out because it's pushed that outside wall out. The vanity, the sinks don't match, I had almond sinks, I get white sinks back, everything in the bathroom is almond. * * * I had * * * two doors and I had in the center between the two doors, was a clothes hamper that flipped out. All I have now is two big face doors. Nothing, no handles on them no nothing, they just open up to nothing. Just two huge doors. No, matter of fact I asked Mark to bring my sinks and stuff back. *

* * He said it was too late. Why they had to be replaced, I don't know, they're made of the same stuff out of the bath, they weren't damaged.

{¶ 85} At the end of the hearing, the Magistrate asked the parties to submit proposed findings of fact and conclusions of law. On January 31, 2014, Perrucci filed "Plaintiff's Trial Brief," and Whittington filed "Defendant, Connie Whittington's Proposed Findings of Fact and Conclusions of Law" on the same day. On February 3, 2014, "Plaintiff's Motion to Set Aside Defendant's Proposed Findings of Fact, Conclusions of Law, Judgment and Order for Further Hearing" was filed. On February 11, 2014, Whittington opposed Perrucci's motion to set aside her proposed findings of fact and conclusions of law.

{¶ 86} On September 9, 2015, the Magistrate issued a Decision. The Magistrate initially noted that, at the conclusion of the evidence, he had requested that the parties submit proposed findings of fact and conclusions of law, that Whittington had complied with the request, and that Perrucci had provided a trial brief. The Magistrate overruled Perrucci's motion to set aside Whittington's proposed findings of fact and conclusions of law.

{¶ 87} The Magistrate found that Whittington's mobile home is her primary residence, that she contracted with Perrucci to perform restoration work "as a result of a flood that occurred at the mobile home," and that the scope of the work was set forth in a document prepared by Foremost. According to the Magistrate, there was no signed agreement between the parties for the work to be performed, and Whittington signed over the first check she received from Foremost to Perrucci. The Magistrate found that Whittington did not receive a receipt for the payment. The Magistrate found that Perrucci

served as a general contractor on the project and employed various subcontractors, and that in August 2012, Whittington expressed displeasure regarding Perrucci's work. The Magistrate found that Perrucci "indicated that the work had been performed in a workmanlike manner and refused to address" Whittington's concerns, and he was terminated.

{¶ 88} After Perrucci's termination, according to the Magistrate, Michael Laughlin inspected the work performed by Perrucci and indicated that "the work was not acceptable and not of a workmanlike standard, and that he would not have paid for the work" if it was done in his own home. The Magistrate found Laughlin's testimony "was credible and worthy of belief." The Magistrate noted Hellman's expert testimony and also determined that Hellman "was credible and worthy of belief."

{¶ 89} The Magistrate noted Perrucci's inconsistent testimony between his deposition and trial regarding the amount of construction work he has performed and determined that Perrucci "was not credible or worthy of belief." The Magistrate noted that Perrucci filed a mechanic's lien against Whittington's property in the amount of $5,336.00, and that he presented evidence at trial and in pleadings that any amount owed equaled $4,925.04, "without any credible explanation being offered for the difference in amounts."

{¶ 90} The Magistrate found that Whittington is a "consumer," Perrucci is a "supplier," and the parties engaged in a "consumer transaction" pursuant to the CSPA. The Magistrate found that Perrucci violated the CSPA in nine ways, namely by: 1) filing the mechanic's lien in excess of the balance due per the agreement; 2) failing to perform the restoration in a workmanlike manner and correct any defects; 3) failing to provide a

written notice of the reasonably anticipated completion date; 4) failing to provide Whittington with a list of repairs performed, including a list of materials, the amount charged for labor and the identity of the individual performing the repairs; 5) failing to provide Whittington with a written quotation indicating that the quotation is binding for five days; 6) failing to provide a written receipt upon the initial payment stating whether the deposit is refundable; 7) failing to provide Whittington with a written list of warranties, notice of whether subcontractors will be used, whether Perrucci is insured under appropriate workers' compensation laws, and whether Perrucci met applicable licensing and bonding requirements; 8) failing to provide a written contract containing the anticipated completion date, type and brand of insulation to be installed, the number of square feet to be covered and the "R-value" of the insulation, its thickness in inches, and the number of packets to be used; 9) failure to provide a "CONSUMER INFORMATION CARD" upon completion of the project. The Magistrate found that all of the above violations of the CSPA "have already been deemed in violation of said Act by cases set forth in the Ohio Attorney General's Public Inspection File."

{¶ 91} The Magistrate found that Whittington "established damages with reasonable certainty in the amount of [$11,029.61] as set forth in the estimate of Dunn Well Construction," and that Whittington "elected to pursue damages, rather than re[s]cission of the contract, as she was entitled to do." The Magistrate found that Whittington was also entitled to statutory damages in the amount of $200.00 for each of Perrucci's CSPA violations. According to the Magistrate, there "was sufficient evidence to conclude" that Perrucci knowingly committed the violations, and that he failed to establish "a 'bona fide' error defense at trial, nor was it asserted as an affirmative

defense."

**{¶ 92}** The Magistrate further concluded that "it is clear from the credible testimony of the various witnesses that [Perrucci] breached his contract with [Whittington] by his failure to provide services in a workmanlike manner." According to the Magistrate, Perrucci failed to acknowledge or correct the problems with his work as presented to him by Whittington, and his conduct "would appear to be an act of engaging in a pattern of inefficiency, or incompetency. Such a pattern of behavior has been held to be the basis for a finding of an unfair or deceptive consumer sales practice * * *." The Magistrate found that the Dunn Well Construction estimate for damages "is reasonable" and that Whittington is entitled to a judgment in that amount. The Magistrate determined that Perrucci violated R.C. 1345.02 and 1345.03. The Magistrate noted that Whittington submitted certification from the Public Inspection File of the Attorney General's Office in Exhibit D, E, and F, and that she is entitled to treble damages. However, the Magistrate further noted that "the jurisdiction of the municipal court is only Fifteen Thousand Dollars * * * and as such, a judgment cannot exceed that amount." With respect to treble damages, the Magistrate determined that "the most the municipal court can award is Three Thousand Nine Hundred Seventy Dollars and Thirty –nine Cents, which would bring the total judgment to the sum of Fifteen Thousand Dollars * * *."

**{¶ 93}** The Magistrate further found that Perrucci "did not establish that he is entitled to damages against the Defendant by a preponderance of the credible evidence and as such [Whittington] should be granted judgment as to the Plaintiff's complaint." The court noted that Whittington "is awarded reasonable attorney fees as to be determined at a later hearing."

**{¶ 94}** On September 18, 2015, Perrucci filed a "Motion for Leave to File Objections," noting that he recently retained new counsel, and the court granted the motion. Perrucci filed objections on January 4, 2016. Perrucci asserted that he "was not regularly and continuously involved in the construction business and therefore can have no CSPA liability." He further asserted that the Magistrate relied primarily on Hellman's testimony, and that Hellman "was not competent to give this testimony because he was not qualified on the subject matter." According to Perrucci, the Magistrate relied "on the speculative cost to repair estimate of [Hellman]. Even if accepted as valid, the proper measure of damage is the cost to repair less the balance due on the original contract, or $6,105. Any other outcome permits the Defendant to have windfall, which is not the goal of any legal form of recovery." Perrucci objected specifically as follows:

1. The Court Erred in Finding that Plaintiff was a Supplier under the CSPA.

2. The Court Erred in Finding that Plaintiff Did Not Complete Renovations in a Workmanlike Manner.

3. The Court Erred in Qualifying James Hellman as an Expert Witness on Mobile Home Restoration Work, and in Finding that His Opinions Were Based on Reliable Principles and Methods.

4. The Court Erred in Finding that Defendant's Witnesses were more credible than Plaintiff's Witnesses.

5. The Court Erred in Calculating Breach of Contract Damages.

6. The Court Erred in Finding that Plaintiff was Given an Opportunity to Cure Defects.

7.   The Court Erred in Refusing to Allow Shawn Allamon to Testify

About the Factual Assumptions Contained in Hellman's Report.

**{¶ 95}**  Whittington opposed Perrucci's objections on February 25, 2016.  We note that Whittington only addressed five of Perrucci's seven objections. On March 14, 2016, Perrucci filed a reply.

**{¶ 96}** The trial court issued its "Entry" overruling Perrucci's objections and adopting the decision of the Magistrate on November 22, 2016.  Regarding Perrucci's assertion that he was not a supplier within the meaning of the CSPA, the court noted that the "Magistrate was presented with two very different statements from [Perrucci] relating to his business experience.  One statement was made during [Perrucci's] deposition, where he claimed that he had performed this type of work about 30 times over the last three years."   The court noted that at trial, however, Perrucci "appears to have changed his testimony, stating that he had only done two construction jobs over the last two years." The court noted that Perrucci's deposition testimony was used to impeach him.

**{¶ 97}** The court noted that this Court "has held that the Ohio Consumer Sales Practices Act is applicable to home improvement products and services, as they are 'consumer goods or services.' "   The court specifically found Kaska's testimony that he did not recommend Perrucci to Whittington "not credible or worthy of belief."   The court found that Perrucci "provided [Whittington] with a written estimate which had identified him as 'Mark Perrucci – Sani Home', inferring a professional or business title."   The court noted Kaska's testimony that he believed construction work to be "part" of what Perrucci does, and that he believed the majority of Perrucci's work was in information technology, and it noted Perrucci's assertion that he was not engaged in construction on a regular

basis. According to the court, "this does not establish that he was not in the construction business or hold himself out [sic] as a person engaged in a construction business at the time that [Perrucci] met [Whittington] and undertook the project of repairing [Whittington's] residence." The court found that "[i]t only establishes that as of the date of this witness' testimony, Mr. Kaska no longer believed that he was engaged in that line of work." The court determined that "a review of the transcript clearly demonstrates that [Perrucci] was perceived as a 'supplier.' "

{¶ 98} Regarding Perrucci's second objection, the court noted that both Hellman and Laughlin testified "that the work performed by the Plaintiff and his crew or subcontractors was defective." The court noted that Laughlin "has no interest in this matter," and that he testified as "a layperson with some experience and knowledge about these types of matters." The court noted that Hellman "was qualified as an expert witness. * * * Mr. Hellman testified with specificity that the work that was performed was not done in a workmanlike manner." It was significant to the court that Hellman "provided, during the direct examination and cross-examination, numerous specific examples of what he was referring to. He testified as to the costs to correct the problems resulting from the actions of [Perrucci] and his workers."

{¶ 99} The court noted that under Evid.R. 702, "the test for whether an individual qualifies to be determined an expert is whether that witness who is offered as an expert will aid the trier of fact in the search of the truth," and noted that Hellman was licensed as a general contractor and registered as such in Montgomery County. The court further noted that Hellman "has performed carpentry work for 40 years, and the issues that were presented appeared to be concerned with carpentry." The court noted that the basis of

Whittington's objection "appears from the transcript to have been based solely upon the fact that Mr. Hellman did not observe [Perrucci] perform that work and could not testify with specificity as to whether or not any problems with that work were the product of [Perrucci's] actions." The court noted that there "do not appear to be any specific objections made as to whether or not Mr. Hellman was in fact qualified to testify as an expert." The court further noted that a litigant's failure to raise an issue at trial waives the right to do so on appeal. The court noted that, assuming that Perrucci "had timely raised objections to Mr. Hellman's qualifications as an expert and that the [M]agistrate overruled such objections, the Court finds that there was sufficient evidence introduced to support the Magistrate's finding that Mr. Hellman was qualified as noted above."

{¶ 100} Regarding the Magistrate's determination that Whittington's witnesses were more credible than Perrucci's, the court noted that "courts won't substitute their judgment for that of the trier of facts on issues of witness credibility unless it is patently apparent that the trier of fact lost its way." The court noted that it conducted an independent review of the record and found there is "more than sufficient evidence from the transcripts and evidence submitted to support the Magistrate's finding that [Perrucci] and his witnesses were not credible or worthy of belief."

{¶ 101} Regarding the Magistrate's computation of damages, the court found that while "it is true that the normal computation of damages would be for the court to subtract the remainder of a contract price charged by [Perrucci] from any judgment due to [Whittington], in this case, the Magistrate did not award any damages to [Perrucci] in order for the damages to be credited against the amount granted to the judgment." The court noted that the "Court of Appeals in *Sites v. Moore* (1992) 79 Ohio App.3d 694 held that a

'Breaching party is not entitled to collect damages from a nonbreaching party' in a suit for breach of contract." The court noted that its "review of the evidence indicates that the estimate of damages by Mr. Hellman in fact was to correct the damages resulting from the Plaintiff's work. [Perrucci's] argument that the estimate was speculative and therefore not proper evidence of [Whittington's] damages is contrary to both logic and law." The court noted that, based upon Perrucci's argument, "the only measure of damages that could be considered in any civil action would be those damages actually paid for." The court indicated that it examined the transcript and the estimate, and noted that it "would appear that the estimate covers the repair for the work that was performed by [Perrucci], not as characterized by [Perrucci] in his objections." The court further found that there was "sufficient evidence * * * to support a finding that [Whittington] had discussed her concerns with [Perrucci] about the workmanship which he and his work crew had performed and that he was discharged after he denied that there was a problem and refused to address [Whittington's] concerns."

{¶ 102} Regarding Perrucci's objection to the trial court's refusal to allow Allamon to testify about Hellman's report, the Magistrate noted that counsel for Perrucci "appears to have either read a different transcript of the proceedings than the one before the Court or in the alternative not thoroughly reviewed the court's official transcript." The court noted that counsel for Whittington "had timely requested a list of expert witnesses" pursuant to Civ.R. 26(B)(5), and that counsel for Perrucci "appears to have acknowledged that he did not supplement his answers as required under the civil rules and disclose those parties as experts at a later date." The court noted that Whittington "objected to permitting those witnesses to testify as experts since [Perrucci] failed to comply with the

civil rules. It is clear that the Magistrate was well within his rights to exclude those witnesses from testifying." The court noted that counsel for Perrucci "infers that the Magistrate refused to allow Mr. Allamon to testify at all, but that is not the case. The transcript of the proceeding shows that the Magistrate did allow Mr. Allamon to testify, only not as an expert."

{¶ 103} The hearing on the issue of attorney fees was held on April 24, 2017; counsel for Whittington, Jonathan Zweizig and Attorney Robert J. Huffman, Jr., testified. Zweizig testified that he was seeking attorney fees in the amount of $19,908.43. He presented Exhibit AA, an itemized statement of all of his costs and fees in that amount, which was generated by a software package for billing, and he stated that the statement was accurate.

{¶ 104} Huffman testified that his practice is general litigation, including construction law. Counsel for Perrucci stipulated to Huffman's qualifications as an expert. Huffman testified that he reviewed Exhibit AA and that the all of the hours billed were reasonable, and that none of the work was unnecessary or redundant. He stated that Exhibit AA reflected an hourly rate of $250.00 per hour from 2012 until 2015, and then an hourly rate of $260.00 from 2016 until 2017, and an hourly rate of $275.00 for the year of 2017. Huffman stated that he has worked "with and against" Zweizig and knows him to be "very competent in handling all aspects of civil litigation." Huffman testified that Zweizig's rates were in the average range and "within the accepted standards of this market." Huffman testified that he quantified the time reflected in Exhibit AA and attributed "80 percent of the invoice to the consumer claim" to a reasonable probability. He stated that "you can't pursue the consumer claim without defending the contract claim.

They're intertwined in terms of elements in proof or disproof if the original contract claim is trying to prove that it was done in a workmanlike manner you are likewise trying to establish that that wasn't true."

**{¶ 105}** On cross-examination, Huffman stated that Perrucci asserted a single claim for breach of contract, and Whittington asserted 13 affirmative defenses, the tenth of which was a violation of the CSPA. He stated that Whittington's four counterclaims were for breach of contract, negligence, failure to perform in a workmanlike manner, and the CSPA claim. Huffman stated that he has prosecuted and defended CSPA claims in his practice, although not in the last three years. He stated that he is "staying up to date on it, I'm familiar with the Attorney General's case file." Huffman testified as follows: "I have looked this bill over about four times and I would say to my recollection I never, in looking it over again now, for about the fourth time, I do not see the words Consumer Sales Practices Act in the invoice, or on Exhibit AA." Counsel for Perrucci objected to the admission of Exhibit AA because the "third-party" who "keystroked" the entries was not available to testify. Zweizig responded that he writes "the time down, the secretary * * * types it up. That is then presented in a monthly packet that we receive on her case and I review it and approve it to make sure it was timed accurately and then sent out for billing and summarized in Exhibit AA. So yes, it was reviewed and approved by me before it ever goes out * * *." Exhibit AA was admitted.

**{¶ 106}** The Magistrate issued a decision in August 2017 awarding Whittington $15,926.74 in attorney fees. Perrucci objected on October 5, 2017, with leave of court. Whittington opposed the objections on October 10, 2017, and the court overruled the objections on November 27, 2017.

{¶ 107} Perrucci asserts six assignment of error herein. His first assignment of error is as follows:

THE TRIAL COURT ERRED IN FINDING THAT APPELLEE MET HER BURDEN OF PROVING APPELLANT WAS A SUPPLIER UNDER THE CSPA.

{¶ 108} Perrucci asserts that to "the extent the trial court found Perrucci was a 'supplier' simply because Defendant perceived him to be one, such finding is clearly inconsistent with the definition of 'supplier' set forth in R.C. §1345.01 and constitutes an abuse of discretion." Perrucci asserts that Whittington failed to provide *any* evidence that Perrucci was a supplier. For example, "[Whittington] did not offer *any* proof that Perrucci had a construction company, regularly worked in construction, or actively sought out construction work during the applicable time period." (Emphasis sic.) Perrucci asserts that "when read as a whole, Kaska's testimony is entirely consistent," and further consistent with Perrucci's. Perrucci asserts that he "does not have a construction business or employees, does not advertise or otherwise seek out construction work, and only performed this construction job for Defendant because he was recommended by Kaska." According to Perrucci, he and "Kaska testified that Perrucci has the skills and experience to perform construction work, but from 2010 to the present he has been working full time in the sanitation and information technology business and only taking a few small jobs on the side." Perrucci asserts that he corrected his "deposition mistake" at trial regarding his history of construction work. Perrucci asserts that his and Kaska's trial testimony remain "unrebutted."

{¶ 109} Whittington responds that Perrucci's "attempt to 'correct' his 'mistake' at

trial conveniently overlooks the fact that [Perrucci] never bothered to 'correct' his mistake when he exercised his right to review his deposition transcript." According to Whittington, Perrucci's "inability to keep his story straight as to his prior work experience not only serves to refute the instant Assignment of Error but, in addition, also lays the groundwork for perhaps why the Magistrate expressly found that [Perrucci] 'was not credible or worthy of belief'. "

{¶ 110} As this Court has previously noted:

Pursuant to Civ.R. 53(D)(3)(b), a party who disagrees with a magistrate's proposed decision must file objections to said decision. Claims of trial court error must be based on the actions taken by the trial court, itself, rather than the magistrate's findings or proposed decision. When reviewing objections to a magistrate's decision, the trial court is not required to follow or accept the findings or recommendations of its magistrate. *Breece v. Breece*, 2d Dist. Darke No. 99-CA-1491, 1999 WL 999759 (Nov. 5, 1999); *Seagraves v. Seagraves*, 2d Dist. Montgomery Nos. 15047 and 15069, 1995 WL 559970 (Aug. 25, 1995). In accordance with Civ.R. 53, the trial court must conduct an independent review of the facts and conclusions contained in the magistrate's report and enter its own judgment. *Dayton v. Whiting*, 110 Ohio App.3d 115, 118, 673 N.E.2d 671 (2d Dist. 1996). Thus, the trial court's standard of review of a magistrate's decision is de novo.

An "abuse of discretion" standard is the appellate standard of review. When an appellate court reviews a trial court's adoption of a magistrate's

report for an abuse of discretion, such a determination will only be reversed where it appears that the trial court's actions were arbitrary or unreasonable. *Proctor v. Proctor*, 48 Ohio App.3d 55, 60-61, 548 N.E.2d 287 (3d Dist. 1988). Presumptions of validity and deference to a trial court as an independent fact-finder are embodied in the the abuse of discretion standard. *Whiting,* supra.

*Lewis v. Lewis*, 2d Dist. Greene No. 2013 CA 68, 2014-Ohio-958, ¶ 10-11.

{¶ 111} "The Consumer Sales Practices Act prohibits unfair or deceptive acts and unconscionable acts or practices by suppliers in consumer transactions." *Einhorn v. Ford Motor Co.*, 48 Ohio St.3d 27, 29, 548 N.E.2d 933 (1990). As noted in *Einhorn*:

The Consumer Sales Practices Act is a remedial law which is designed to compensate for traditional consumer remedies and so must be liberally construed pursuant to R.C. 1.11. Roberts & Martz, Consumerism Comes of Age: Treble Damages and Attorney Fees in Consumer Transactions—the Ohio Consumer Sales Practices Act (1981), 42 Ohio St. L.J. 927, 928–929.

*Id.*

{¶ 112} R.C. 1345.02(A) provides that no "supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction." R.C. 1345.01(C) provides: " 'Supplier' means a seller, lessor, assignor, franchisor, or other person engaged in the business of effecting or soliciting consumer transactions, whether or not the person deals directly with the consumer." R.C. 1345.01(D) provides: " 'Consumer' means a person who engages in a consumer transaction with a supplier." R.C.

1345.01(A) provides: " 'Consumer transaction' means a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things."

{¶ 113} As noted by the Southern District Court of Ohio, Western Division:

Although no Ohio court has defined the level of business activity required for a finding that one is "engaged in the business of" effecting or soliciting consumer transactions, the Defendant urges and the Court agrees that the phrase implies more than one isolated sale, especially when that sale is not within the seller's usual course of business. The phrase "engaged in the business of" is commonly used in statutory schemes and has generally been held to connote continuous or regular activity, rather than a singular or isolated sale. *See United States v. Tarr*, 589 F.2d 55 (1st Cir.1978) (the words "to engage in the business of" strongly imply more than one isolated sale or transaction); *Fillippo v. S. Bonaccurso & Sons, Inc.*, 466 F.Supp. 1008 (E.D.Pa.1978) ("being engaged in an activity requires more than a single act or transaction or occasional participation"); *UFITEC, S.A. v. Carter*, 20 Cal.3d 238, 571 P.2d 990, 142 Cal.Rptr. 279 (1977) (the phrase "engaged in the business of" connotes a certain regularity of participation).

*Moore v. Florida Bank of Commerce*, 654 F.Supp. 38, 41 (S.D.Ohio 1986).

{¶ 114} We conclude that the evidence supports the trial court's determination that Perrucci was engaged in the business of construction, as a supplier, at the time he agreed

to repair the damage to Whittington's mobile home. The trial court correctly noted that Perrucci's credibility at trial was impeached by his deposition testimony. At his deposition, Perrucci testified that he had "been in the construction industry for about 35 years," and that he had "35 years of experience on the job." He testified that in the last three years, he had 30 construction jobs. He testified that he learned of the Whittington job from Kaska, who "told me there was a woman who had a job if I would like to take a look at it." He testified that Service Master, where Kaska is employed, does not do construction work, and that they assign the work to "various contractors" in "a pool they just start calling." He testified that he "got Connie's number from Bill and I called her up, set up an appointment and went up the next day." While Perrucci testified that the final estimate was prepared by Foremost, the document provides: "Mark Perrucci – Sani Home" on every page and identifies Perrucci as the "estimator." The following exchange occurred in Perrucci's deposition regarding "Sani-Home":

Q. Did [Sani-Home] do the work on the home or did you do the work on the home?

A. I did the work on the home. Sani Home was a company that I run that had a bank account established.

Q. Just for this project or for your construction projects?

A. No, *it was for construction projects*.

(Emphasis added.)

{¶ 115} At his deposition, Perrucci was asked if he had ever heard of the CSPA, and he said no. We find the evidence supports the trial court's determination that Perrucci was not credible.

{¶ 116} Kaska's testimony that he did not recommend Perrucci to Whittington defies credulity, as the trial court determined. It is clear from his testimony that but for Kaska, Whittington would not have met Perrucci. Kaska, who has extensive experience in the construction industry, who has known Perrucci since 1995 or 1996, who regularly works with "lots" of contractors in the course of his business, and who believed Perrucci capable of performing the work, provided Whittington with Perrucci's name as a potential contractor for the job. Since Perrucci was a supplier engaged in a consumer transaction while working on Whittington's mobile home, his first assigned error lacks merit and it is overruled.

{¶ 117} Perrucci's second assignment of error is as follows:

THE TRIAL COURT ERRED IN QUALIFYING JAMES HELLMAN AS AN EXPERT WITNESS ON MOBILE HOME RESTORATION WORK, AND IN FINDING THAT HIS OPINIONS WERE BASED ON RELIABLE PRINCIPLES AND METHODS.

{¶ 118} According to Perrucci, the "trial court found that Hellman was qualified as an expert witness because he previously testified as an expert before the court. However, just because Hellman may be an expert in some aspects of constructions [sic] does not mean he is an expert on the issues before the court in this case." Perrucci asserts that "the issues before the court in this case were the proper standard of care for repairing a mobile home and the way in which Perrucci's work compared to that standard." Perrucci argues that the "only license [Hellman] holds is a Montgomery County general contractor license; he does not hold a license in plumbing, electrical, or HVAC work." According to Perrucci, the "most egregious aspect of Hellman's testimony is that he failed

to show that the methodology underlying his testimony is scientifically valid. It is apparent from the transcript that Hellman applied the wrong construction code when doing his analysis and lacked first-hand knowledge of key facts."

**{¶ 119}** Perrucci asserts as follows:

Hellman bases his opinion that the floors were not properly reinstalled on the Housing and Development Code, which only applies to mobile homes manufactured after 1976. * * * Hellman stated that he used the Housing and Development Code because the mobile home was manufactured in 1989. * * * When asked how he knew the age of the mobile home, Hellman stated that he relied solely on the owner's recollection. * * * He did not provide any evidence that the owner's recollection was accurate. In fact, the Miami County Auditor's records indicate that the mobile home was actually made in 1974. * * * This is an important fact because the Code changed from 1974 to 1976. Hellman was unfamiliar with the applicable building code, failed to review easily accessible public records to determine the age of the mobile home, and reviewed the wrong building code because he relied upon the owner's recollection and did not verify the date of the data, and his opinions were both wrong and inadmissible. His assessment of floor construction was not scientifically valid, leading him to incorrect conclusions.

**{¶ 120}** Perrucci further asserts that Hellman "relied on third-party testimony. Evid.R. 703 *requires* that opinion testimony be based on facts perceived by the expert or admitted in evidence at the hearing. Opinions based on the knowledge and advice of third

parties are inadmissible." (Emphasis added.) According to Perrucci, "Hellman based his opinion that Defendants could not have repaired the mobile home in the way they claimed solely on conversations with a mobile home manufacturer." Perrucci argues the fact that "Hellman had to consult with an expert on mobile home manufacturing to form his opinion, which witness was not available at trial for Plaintiff to cross-examine, is the clearest reason why he was not competent to serve as an expert in this case." He argues that in the absence of Hellman's testimony, Whittington's "defense that Plaintiff did not make repairs in a workmanlike manner must fail."

{¶ 121} We conclude that Hellman was properly qualified as an expert in carpentry by the trial court. Evid.R. 702 provides:

A witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *

{¶ 122} As this Court has previously noted:

Foundational requirements for admission of an expert's opinion testimony are set forth in Evid.R. 703 and 705. Evid.R. 703 provides, "The facts or data in the particular case upon which an expert bases an opinion

or inference may be those perceived by the expert or admitted in evidence at the hearing." Evid.R. 705 provides, "The expert may testify in terms of opinion or inference and give the expert's reasons therefor after disclosure of the underlying facts or data. The disclosure may be in response to a hypothetical question or otherwise."

"Where an expert bases his opinion, in whole or in major part, on facts or data perceived by him, the requirement of Evid.R. 703 has been satisfied." *State v. Solomon* (1991), 59 Ohio St.3d 124, 570 N.E.2d 1118, syllabus. In *Solomon,* the trial court excluded expert testimony because the experts' opinions were based, in part, on medical and police reports not in evidence. The Supreme Court of Ohio held that the expert testimony should have been admitted because the experts had personally examined the defendant and "thus, had based their opinions on facts or data perceived by them." Id. at 126. See also *State v. Hoover–Moore,* Franklin App. No. 03AP–1186, 2004-Ohio-5541, ¶ 35 ("the Ohio Supreme Court adopted a more relaxed interpretation of Evid.R. 703 in [*Solomon*]").

*Fry v. King*, 192 Ohio App.3d 692, 2011-Ohio-963, 950 N.E.2d 229, ¶ 7-8 (2d Dist.).

**{¶ 123}** As this Court has further noted:

It is well established that the expert witness need not be the best witness on the subject. *Alexander* [*v. Mt. Carmel Med. Ctr.*, 56 Ohio St.2d 155], at 159, 383 N.E.2d 564. "[T]he test of admissibility is whether a particular witness offered as an expert will aid the trier of fact in the search

of the truth." *Ishler v. Miller* (1978), 56 Ohio St.2d 447, 453, 10 O.O.3d 539, 384 N.E.2d 296.

Whether a witness is qualified to testify as an expert is a matter for the court to determine pursuant to Evid.R.104 (A). *Bedard v. Gardner,* Montgomery App. No. 20430, 2005-Ohio-4196, ¶ 58. The competency of the proposed expert witness is a matter left to the discretion of the trial court, and the court's ruling will be reversed only for an abuse of discretion. *Alexander*, 56 Ohio St.2d at 157, 10 O.O.3d 332, 383 N.E.2d 564.

*Schutte v. Mooney*, 165 Ohio App.3d 56, 2006-Ohio-44, 844 N.E.2d 899, ¶ 25-26 (2d Dist.).

**{¶ 124}** Hellman testified that he grew up in the construction business, working with his grandfather. He testified that he has 40 years of experience as a carpenter. Carpentry is defined in part as "the art or trade of a carpenter; *specifically:* the art of shaping and assembling structural woodwork." See www.meriam-webster.com/dictionary/carpentry (accessed July 14, 2018). The majority of the work performed by Allamon was carpentry as reflected in the final estimate. The transcript is clear that the bulk of the problems at the mobile home stemmed from the installation of the sub-floor, the removal of the laundry room wall, and the replacement of the vanity, all of which involved carpentry. Further, Hellman has owned Dunn Well Construction since 2000. There is no indication that the trial court qualified Hellman as an expert witness simply because he had previously provided expert testimony in another matter before the court. Hellman testified that he read the final estimate and investigated the mobile home to determine if the work that Perrucci committed to doing had been done properly. We

have no basis to conclude, as Perrucci asserts, that Hellman's opinion is based on "the wrong construction code." Hellman did not delineate a specific construction code, he merely indicated that there are specific codes applicable to mobile homes.

{¶ 125} Regarding Perrucci's argument about the age of the mobile home, based upon Plaintiff's Exhibit 4, which is a printout from the Miami County Auditor's website of Whittington's property, we note that the Exhibit indicates, in part, as follows under a section entitled "Improvements":

| Description | Length | Width | Total Area | Year Built | Appraised Value (100%) |
|---|---|---|---|---|---|
| * * * | | | | | |
| Miscellaneous | 52 | 9 | 468 | 1974 | $1,200.00 |

{¶ 126} We cannot conclude with certainty that the miscellaneous item is the mobile home, as Perrucci suggests. The sketch of Whittington's mobile home attached to the final estimate reflects dimensions of 50 feet two inches by 13 feet six inches, and Whittington's kitchen is not depicted in the drawing. Even if Hellman was mistaken regarding the age of the mobile home, we cannot conclude that the error impacted his testimony regarding carpentry; in other words, his testimony was helpful to the trier of fact.

{¶ 127} For the foregoing reasons, we conclude that the trial court did not abuse its discretion in admitting Hellman's expert testimony, since his expertise in carpentry qualified him to testify. Perrucci's second assignment of error is overruled.

{¶ 128} Perrucci's third assignment of error is as follows:

THE TRIAL COURT ERRED IN FINDING THAT APPELLANT BREACHED THE CONTRACT WITH APPELLEE AND FAILED TO

COMPLETE THE RENOVATIONS IN A WORKMANLIKE MANNER.

**{¶ 129}** Perrucci argues that it "is undisputed that the parties had a contract whereby Perrucci performed the necessary work set forth in the insurance estimate for the amount of $8,682. * * * It is further undisputed that Perrucci completed the work, and that [Whittington] did not pay for the all of the work." Perrucci asserts that Whittington "failed to present *any* evidence to suggest that [Perrucci's] work was not done in a workmanlike manner." Perrucci asserts that Whittington "is incapable of testifying about how Perrucci's work deviated from the applicable standard of care." Perrucci asserted that Whittington's "actions suggest that the work was completed in a workmanlike manner," since she has "lived in the property without doing *any* corrective work."

**{¶ 130}** Perrucci further asserts that Laughlin "is not an expert in the insurance industry and similarly cannot testify about the appropriate standard of care." Perrucci asserts that Laughlin "was either not being truthful when he testified that the quality of the work is poor, or he acted in dereliction of his duty as an insurance adjuster by paying out a claim before the work was done correctly. Either way, his credibility is suspect." Perrucci again asserts that Hellman's testimony "should have been stricken in its entirety."

**{¶ 131}** Perrucci argues that testimony "about using a different method or alternative mode of operation does not equate to defective work, or a failure to meet the standard of care." Perrucci argues that Hellman "never presented evidence as to the industry standard or how [Perrucci's] work differed from that standard."

**{¶ 132}** Perrucci asserts that Allamon "used his judgment and experience to * * * chisel out the old flooring and slide the new floor underneath." Perrucci asserts that "Hellman misunderstands the scope of work. Perrucci was hired to do remedial repair

work to a specific area in the mobile home that was water damaged, based on an estimate of necessary work from Defendant's insurance adjuster." According to Perrucci, "Hellman opined that Perrucci should have renovated the entire mobile home floor. Moreover, he did not specifically state that the failure to replace the entire floor was the cause of the 'springiness,' he merely stated that it could be caused by any number of things." Regarding the underbelly of the mobile home, Perrucci asserts that "the portion of the underbelly that Hellman stated was in good condition was the only portion that Perrucci was hired to repair because it was underneath the water damage." Regarding the laundry room, Perrucci noted that "Hellman testified that Perrucci should not have moved the laundry room wall because it *may have been* a shear (load bearing) wall," but that he did not know if the wall was in fact a shear wall. Finally, according to Perrucci, "Hellman's testimony about the shower, vanity top, furnace, and bathtub similarly fails to specify what a skilled contractor would do under the circumstances, and fails to take into account that contractors often adjust their work based on the extent of damage they find as work progresses." Perrucci asserts that Hellman alluded "to his own personal preferences and opinions, rather than stating the correct standard or method * * *."

{¶ 133} Perrucci argues that while he "did not have the burden to prove his work was done pursuant to the industry standard, he nonetheless presented testimony by three construction professionals – Plaintiff himself, Allamon, and Kaska – who have over 43 years of combined construction experience, and who testified that the work was done according to industry standards, that any variations from the estimate were requested and approved by [Whittington], and that Defendant was consistently telling them how happy she was with the work." Perrucci asserts that he provided "photos of the work

before and after, and an invoice signed by [Whittington] upon which she wrote 'nice job' and drew a smiley face."

{¶ 134} Perrucci asserts that Whittington did not give him "an opportunity to cure defects," and that failure "to give an opportunity to cure amounts to a breach." He asserts that the "only testimony offered by [Whittington] was her nonspecific statement that she was unhappy with everything throughout the process, and that [Perrucci] refused to fix it." Perrucci asserts that he gave "Doug" money to complete the "three or four items" Whittington was unhappy with at their final meeting, and that if "any issues remained after that meeting, [Perrucci] was never notified and given an opportunity to cure them."

{¶ 135} Finally, Perrucci argues that even if "the court was correct in finding all of [Whittington's] witnesses to be credible, and none of [Perrucci's] witnesses to be credible * * *, there was no basis for finding in Defendant's favor. The workmanlike standard is a legal standard and as such it must be proved with something more than a layman's opinion."

{¶ 136} Whittington responds that Perrucci failed to produce an independent lay or expert witness.

{¶ 137} As this Court recently noted:

" 'The essential elements of a cause of action for breach of contract are the existence of a contract, performance by the plaintiff, breach by the defendant, and resulting damage to the plaintiff.' " *Winner Brothers, L.L.C. v. Seitz Elec., Inc.,* 182 Ohio App.3d 388, 2009-Ohio-2316, 912 N.E.2d 1180, ¶ 31 (citation omitted). The common law also imposes a duty upon builders and contractors to perform their duties in a workmanlike manner.

*Hanna v. Groom,* Franklin App. No. 07AP-502, 2008-Ohio-765, ¶ 19. This implied duty requires construction professionals " 'to act reasonably and to exercise the degree of care which a member of the construction trade in good standing in that community would exercise under the same or similar circumstances.' " *Jarupan v. Hanna,* 173 Ohio App.3d 284, 2007-Ohio-5081, 878 N.E.2d 66, ¶ 19, quoting from *Seff v. Davis,* Franklin App. No. 03AP-159, 2003-Ohio-7029, ¶ 19. The proper measure of damages for breach of this implied duty is the cost of repair.

*Sullivan v. Curry*, 2d Dist. Montgomery No. 23293, 2010-Ohio-5041, ¶ 43.

{¶ 138} It is undisputed that the final estimate provided the basis for the parties' oral contract for the repair of Whittington's mobile home in exchange for $8,681.55. The final estimate covered repairs to specific areas of Whittington's home, namely the hallway, the bathroom, the laundry room, the master bedroom, the office, the living room, the furnace room, and the underbelly. We note that on cross-examination, Allamon, who performed the majority of the work there, acknowledged that he did not have the final estimate in his possession, but that "I got what to do from Mark." Considering both the lay and expert witness testimony together, and deferring to the trial court's assessment of witness credibility, we conclude that Perrucci's breach of contract was established.

{¶ 139} For example, in the hallway, the final estimate provided in part, "52. * * * 2 carpenters 4 hours each on day one to remove lift the walls, remove the damaged particle board and prep for the new osb subfloor." Whittington testified that in the hallway, "when they laid the floor down, the wooden part, it doesn't go underneath my wall, and when you walk, it's like a springboard and if you get too close to the edge, and get to the wall,

your shoe will actually go underneath that." Laughlin's testimony was consistent with Whittington's about the flooring along the walls in the home. Hellman testified that he observed that "it was cut along those walls, and the boards were pulled out and replaced *up to the wall.* There was no sign of putting wood underneath * * * these walls," and that "you can't chisel that wood out from under there for two reasons. It's glued and screwed down." (Emphasis added.) While Allamon testified that he used "ledger boards" to anchor the sub-floor, there is no provision for such a system in the contract, and Allamon's testimony, as the trial court noted, was not credible.

{¶ 140} In the bathroom, the final estimate provided for, in part, "79. Bathtub – Detach & reset /Tub had to be removed to replace subfloor underneath." The final estimate also provided, "81. * * * Remove particle board flooring in the bath and under the vanity and shower." It provides, "85. Toilet – Detach & reset," and "86. Vanity – Detach & reset."

{¶ 141} While Allamon testified that he removed the tub, replaced the sub-floor underneath, and then replaced the tub, Whittington and Hellman testified that there was a large hole under the tub. Laughlin observed that the tub was not level. Perrucci testified that he did not remove and replace the toilet. While the contract required Allamon to remove the damaged sub-floor under the shower, he testified that he did not do so. Allamon testified that he gave Whittington "the option of replacing the fixtures and I re-used her old fixtures." He stated that Plaintiff's Exhibit 26 depicts "a scribed in vanity top with a double-bowl sink with the old fixtures," with a new cabinet underneath. Whittington, however, testified that she originally had almond-colored sinks, that she wanted to keep those sinks, but that white sinks were installed that "don't match." The

final estimate does not provide for new sinks. While the final estimate provided for the vanity to be detached and reset, Perrucci testified that he replaced the vanity and put in a new "ledger system." Laughlin observed that the countertop was new and crooked, and Hellman reported that it was too small for the space it is in, which Perrucci "tried to cover up by using a ton of caulk and poor trim work."

{¶ 142} In the laundry room, the final estimate provided for the washer and dryer to be removed and reset after the sub-floor was replaced. Instead, Perrucci moved the appliances into the bathroom. Whittington testified that she did not want the appliances moved, and that "now when you open the [appliances'] doors, they hit each other." Whittington testified that she "never swapped any work out" on the project. Perrucci testified that he did not know if the wall he moved was load-bearing. The final estimate further called for new vinyl flooring in the laundry room, and Whittington testified that it was never put down.

{¶ 143} The final estimate provided for the carpet and pad to be removed and replaced in the master bedroom, and Whittington testified that the floor under the doorway "fell through" under the carpet, and that she fell there.

{¶ 144} While Allamon testified that he replaced the sub-floor in the furnace room, Laughlin testified that the floor "didn't seem to be holding completely level and sturdy but then there was also a hole in the wall." Hellman reported that the "furnace floor is sinking."

{¶ 145} Regarding the underbelly, Allamon testified that he put R 38 insulation under the home along with a moisture barrier, as provided for in the estimate. The estimate calls for blown-in insulation, and Perrucci testified that he installed the vapor

barrier and the insulation himself, that he told Whittington he was not going to use "blow-in insulation," and that she was "fine with it." Whittington testified that her pipes froze during the month of trial.

{¶ 146} Regarding Perrucci's assertion that he was not given the opportunity to cure the defects, Whittington testified credibly that she told him what she wanted done to fix her walls and floor, and that he told her that it could not be done.

{¶ 147} We conclude that Perrucci's assertion that Whittington's conduct in remaining in the home somehow establishes her satisfaction with his work defies logic, given her trial testimony.

{¶ 148} Finally, Whittington, Hellman, and Laughlin testified specifically, and credibly, as to the damage to her home, and simple common sense dictates that if, after a restoration project is completed, the new floors are unstable, a wall and Whittington's appliances have been moved against Whittington's wishes, the ground is visible beneath the bathtub, the vanity is crooked and not what Whittington requested, etc., that the project was not completed in a workmanlike manner. Since Perrucci clearly breached his contract with Whittington and failed to complete the repair to Whittington's mobile home in a workmanlike manner, his third assignment of error is overruled.

{¶ 149} Perrucci's fourth assignment of error is as follows:

THE TRIAL COURT ERRED IN FINDING THAT THE MAGISTRATE CORRECTLY CALCULATED BREACH OF CONTRACT DAMAGES AND THAT DAMAGES WERE PROVEN WITH SPECIFICITY.

{¶ 150} Perrucci argues that the "correct measure of damages is the cost of repair less the amount still owing on the contract." He asserts that by "failing to subtract the

contract price from the cost of repair, the trial court is essentially imposing punitive damages on Perrucci and giving Defendant a double recovery." He argues rather "than awarding Defendant a repaired mobile home, the trial court awarded Defendant a repaired mobile home and $4,925 in cash for Perrucci's breach of contract." He argues that if he is in breach, "the proper measure of damages for that breach is the cost to repair, less the balance of $4,925 owed on the contract."

{¶ 151} Perrucci asserts that "Hellman's estimate should have been excluded because it represented the cost to repair the entire mobile home, rather than the area that was water damaged." He argues that this "is clearly outside the scope of the work contemplated by the parties at the time of contracting: repair of a small area around the bathroom and laundry room that had been damaged." According to Perrucci, "Hellman's estimate would give Defendant a fully renovated mobile home, which is outside the proper measure of damages." Perrucci argues that the "estimate Hellman compiled was speculative and not based on the probable cost of repairs."

{¶ 152} Whittington responds that "the Magistrate did not award any damages to the Appellant in order for the damages to be credited against the amount granted to the judgment." She argues that, based "upon the Appellant's argument, the only measure of damages that could be considered in any civil action would be those damages actually paid for." Whittington argues that "review by the Trial Court only served to confirm the Magistrate's factual findings and legal conclusions that the estimate covered the repair for the work that was actually performed by [Perrucci], not as characterized by the Appellant in his brief."

{¶ 153} In reply, Perrucci asserts that the " 'expectation damages' standard is the

proper measure of damages in a case for failure to perform a construction contract in a workmanlike manner, and thus the trial court should have subtracted the amount remaining on the contract from the damages award." Perrucci asserts that "Hellman's estimate was to repair the entire mobile home as opposed to the small area designated in the contract." In a footnote, he asserts that if this Court "finds that Appellant is not a supplier, and treble damages should not be awarded, then the award will be well under the Court's jurisdictional limit."

{¶ 154} We first note that Perrucci's assertion that Hellman's estimate is speculative lacks merit. Hellman's estimate is dated March 21, 2013, and he testified almost six months later. He merely indicated that the estimate might be a little bit low, given fluxuating prices. Finally, having determined that Perrucci is a supplier, we conclude that this assignment of error lacks merit. Pursuant to R.C. 1345.09(B), Whittington is entitled to treble damages in the amount of $33,088.83, but as the Magistrate noted, the municipal court could only award $3,970.39 (in addition to the $11,029.61 in damages) due to the court's jurisdictional limit of $15,000.00. *See* R.C. 1901.17. Even if the $4,925.00 were to be deducted from the $11,029.61 damage award, leaving a balance of $6,104.61, the trial court's award would remain the same, because treble damages would have been $18,313.83, above the court's jurisdictional limit of $15,000.00. Perrucci's fourth assignment of error is overruled.

{¶ 155} Perrucci's fifth assignment of error is as follows:

THE TRIAL COURT ERRED IN EXCLUDING THE TESTIMONY OF SHAWN ALLAMON REGARDING FACTUAL ASSUMPTIONS CONTAINED IN JAMES HELLMANS' EXPERT REPORT.

{¶ 156} According to Perrucci, the "Magistrate erred in excluding testimony about the accuracy of Hellman's report from Allamon, a fact witness with firsthand knowledge of the work done on [Whittington's] mobile home." Perrucci asserts that Allamon "was asked whether any of his work needed to be redone." He argues that "Allamon did the work in question himself and had firsthand knowledge about the quality of the work bearing on an issue for decision, namely whether the repairs were of workmanlike quality, and whether the items listed in Hellman's estimate needed to be repaired."

{¶ 157} Whittington responds that the "instant Assignment of Error completely misrepresents the facts of the case. Witness Shawn Allamon was not permitted by the Trial Court to testify as an expert witness based upon [Perrucci's] failure to properly identify him as an expert witness. The trial court did, however, allow Shawn Allamon to testify at trial as a non-expert witness." We agree with Whittington, and note that Allamon testified extensively regarding his work on the project and his experience. Perrucci mischaracterizes the record, and his fifth assignment of error is overruled.

{¶ 158} Perrucci's final Assignment of Error is as follows:

THE TRIAL COURT ERRED IN CALCULATING THE AMOUNT OF ATTORNEYS' FEES DEFENDANT WAS ENTITLED TO RECOVER.

1. The trial court erred in relying on Robert J. Huffman Jr.'s testimony that 80% of Defendant's fee bill was attributed to Defendant's CSPA claims.

2. The trial court erred in finding that 100% of the fees associated with Defendant's CSPA claim were reasonable and necessary.

{¶ 159} Perrucci asserts that Huffman "lacks the experience and qualifications necessary to testify as an expert on the reasonableness of fees expended upon the

prosecution or defense of CSPA claims." He argues that Huffman "failed to provide reliable evidence that 80%" of Zweizig's bill "was attributable to prosecuting Defendant's CSPA claims." Perrucci asserts that he brought a single claim for breach of contract, and that only one of Whittington's 13 affirmative defenses involved the CSPA and only one of her four counterclaims was a CSPA claim. Perrucci notes that Huffman testified that the words "Consumer Sales Practices Act" do not appear in Exhibit AA. He asserts that Exhibit AA "was not sufficiently specific to allow Huffman to determine what portion of the work was spent on CSPA claims."

{¶ 160} Perrucci asserts that "after finding that 80% of the attorney's fees were attributable to Defendant's CSPA claims, the court was required to determine if all of the CSPA-related fees were reasonable." Perrucci asserts that the Magistrate did not state the basis for finding that all CSPA claims were fair and reasonable. He argues that "the CSPA claims were only related to a few specific factual allegations, the litigation of which was not particularly time consuming, novel, or labor intensive."

{¶ 161} "[P]ursuant to R.C. 1345.09(F), a trial court may award a consumer reasonable attorney fees when the supplier in a consumer transaction intentionally committed an act or practice which is deceptive, unfair or unconscionable." *Einhorn,* 48 Ohio St.3d 27, 30, 548 N.E.2d 933. As this Court has previously noted:

> A court calculates reasonable attorney's fees by first calculating the "lodestar," "the number of hours reasonably expended on the case times an hourly fee." *Bittner v. Tri–County Toyota, Inc.,* 58 Ohio St.3d 143, 145, 569 N.E.2d 464 (1991). In this calculation, the court must exclude "any hours that were unreasonably expended, e.g., hours that were redundant,

unnecessary or excessive in relationship to the work done." (Citation omitted.) *Miller v. Grimsley,* 197 Ohio App.3d 167, 2011–Ohio–6049, 966 N.E.2d 932, ¶ 14 (10th Dist.). Then the court may modify the lodestar by applying the factors listed in Prof.Cond.R. 1.5, *Bittner* at 145, one of which is "the amount involved and the results obtained," Prof.Cond.R. 1.5(a)(4). Still, " '[a] "reasonable" fee must be related to the work reasonably expended on the case and not merely to the amount of the judgment awarded.' " *Miller* at ¶ 16, quoting *Roth Produce Co. v. Scartz,* 10th Dist. Franklin No. 01AP–480, 2001 WL 1654555 (Dec. 27, 2001).

*Spring Hill Townhomes v. Pounds*, 2d Dist. Montgomery No. 25887, 2014-Ohio-1980, ¶ 18.

{¶ 162} We initially note that Perrucci stipulated to Huffman's qualifications as an expert witness at the hearing on attorney fees. We note that the trial court found that Huffman "is an experienced trial attorney, held in high regard by this Court." As the trial court further noted in overruling Perrucci's objections, Perrucci "brought this claim and is in large part responsible for the length of time it took to resolve. Failing to award the defending party attorney's fees, as it was an hourly fee agreement, would diminish her recovery."

{¶ 163} Zweizig testified that Exhibit AA was a true and accurate billing statement. Huffman testified that he has experience with construction litigation and the CSPA. He testified that the number of hours expended as reflected in Exhibit AA was reasonable, and that none of the work was excessive or redundant. Huffman stated that Zweizig's costs and expenses were also reasonable, and that his hourly rates over the years were

fair and reasonable and within the accepted standards of this market. Huffman testified that pursuing Whittington's CSPA claim necessarily overlapped with defending Perrucci's contract claim. Huffman expressed his opinion to a reasonable probability, and Perrucci presented no evidence to the contrary. We have reviewed Exhibit AA and find it to be very detailed. That the CSPA is not expressly mentioned in Exhibit AA does not diminish Huffman's opinion; multiple entries provide that Zweizig reviewed documents, corresponded with his client, prepared documents, prepared for trial, etc., and naturally a percentage of that work involves the CSPA. Huffman, as a stipulated expert, has the expertise to determine that percentage. As did the trial court, we conclude that his opinion that 80 percent of the total billings is related to the CSPA is reasonable. Accordingly, Perrucci's sixth assignment of error is overruled.

{¶ 164} Having overruled all of Perrucci's assigned errors, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

WELBAUM, P.J. and FROELICH, J., concur.


Copies mailed to:

Robert Kehoe
Jonathan Zweizig
Hon. Elizabeth S. Gutmann